# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 11-2057

_____

United States of America,     *
    *
      Plaintiff - Appellee,     *
    *
      v.     *
    *
Christopher L. Elder,     *
    *
      Defendant - Appellant.     *

_____

No. 11-2145

_____

Appeals from the United States
District Court for the
Western District of Missouri.

United States of America,     *
    *
      Plaintiff - Appellee,     *
    *
      v.     *
    *
Troy R. Solomon,     *
    *
      Defendant - Appellant.     *

_____

Submitted: February 16, 2012
Filed: July 2, 2012

_____

Before LOKEN, BYE, and MELLOY, Circuit Judges.

_____

LOKEN, Circuit Judge.

After a seven-day trial, a jury found Troy Solomon and Dr. Christopher Elder guilty of conspiring to dispense and distribute and aiding and abetting the distribution of hydrocodone (trade names Lortab and Lorcet), alprazolam (Xanax), and promethazine from a Missouri pharmacy to Houston, Texas. See 21 U.S.C. §§ 841(a)(1) and 846. The jury also convicted Solomon of conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h). The district court[1] varied downward and sentenced Solomon to 24 months and Dr. Elder to 15 months in prison.[2] The court ordered both defendants to pay joint and several forfeiture judgments of $991,114 under 21 U.S.C. § 853. On appeal, defendants challenge the sufficiency of the evidence supporting their convictions and forfeitures, and Dr. Elder argues the district court abused its discretion in not severing his trial from Solomon's. We affirm.

## I. Sufficiency of the Evidence

In considering these issues, we view the evidence in the light most favorable to the jury's verdict. United States v. Smith, 573 F.3d 639, 657 (8th Cir. 2009).

A. The Controlled Substances Convictions. Solomon, Dr. Elder, and others were charged with conspiring to dispense and distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), which prohibits dispensing and distribution "[e]xcept as authorized by this subchapter." When the alleged offense involves the distribution of drugs prescribed by a licensed physician registered under the federal

---

[1] The Honorable Fernando J. Gaitan, Jr., Chief Judge of the United States District Court for the Western District of Missouri.

[2] The government dismissed sentencing cross-appeals.

Controlled Substances Act, the government must prove that the physician's activities "fall outside the usual course of professional practice." United States v. Moore, 423 U.S. 122, 124 (1975); see Smith, 573 F.3d at 657.

The government's evidence at trial established that chiropractor Pleshette Johnson-Wiggins and her mother opened the South Texas Wellness Center ("STWC") in Houston in early 2004. That summer, Dr. Elder began working as its medical director, and drug salesman Troy Solomon began "investing" in STWC by delivering bundles of cash to cover "overhead." In August, Solomon asked Cynthia Martin if she knew a pharmacist who would fill mail-order prescriptions for doctors with "high-profile customers" interested in confidentiality. Martin contacted her friend Mary Lynn Rostie, owner and head pharmacist of The Medicine Shoppe ("TMS") in Belton, Missouri. Rostie and Solomon negotiated prices for medications containing hydrocodone, a Schedule III controlled substance, alprazolam, a Schedule IV controlled substance, and promethazine, a Schedule V controlled substance, and discussed how to get the drugs from Missouri to Houston. Following these conversations, between August 2004 and October 2005, TMS filled prescriptions written by three Houston doctors, including Dr. Elder, for 2,026,666 dosage units of hydrocodone, 336,240 dosage units of alprazolam, and 1,727,381 milliliters of promethazine with codeine.

Between August and October 2004, Martin delivered to TMS 544 prescriptions written by Dr. Elder at STWC. Most were for medications containing hydrocodone and alprazolam; the rest were for a syrup containing promethazine. When the prescriptions did not include dates or patient addresses, TMS staff requested the missing information from Solomon by phone. From his home, Solomon faxed handwritten lists of patient addresses and dates of birth, corresponding to Dr. Elder's prescriptions and sorted by medication. TMS then filled the prescriptions and sent them to STWC, addressed to Dr. Elder. At STWC, the boxes of medications were

signed for by clinic staff -- and by Dr. Elder on one occasion -- and then taken to the office of Ascencia Nutritional Pharmacy ("ANP"), a pharmacy co-owned by Solomon located on the same floor as STWC. ANP employee Delmon Johnson delivered the boxes to Solomon or his co-owner. STWC never distributed medications to patients.

In November 2004, TMS began refilling large batches of Dr. Elder's original prescriptions that stated no refills. Without patient contact, TMS faxed refill requests for fifty to one hundred patients at a time to Solomon for Dr. Elder's authorization. Solomon's faxed replies included Dr. Elder's signature authorizing the refills. In January 2005, Dr. Elder ended his employment at STWC but Solomon continued faxing refill authorizations for Dr. Elder's prescriptions until at least August 2005. TMS filled many of Dr. Elder's 544 original prescriptions at least ten times, uniformly refilling large batches about once a month. In 2005, TMS also filled prescriptions written by Houston physicians Peter Okose and Juan Botto (neither charged in this indictment), using address information that Solomon faxed from his home. Dr. Okose's prescriptions began arriving at TMS and ANP around the time Dr. Elder ended his employment at STWC. Dr. Okose typically submitted very large numbers of pre-printed prescriptions -- up to 150 per day -- written for patients whose last names started with the same letter. Dr. Botto did not write the relatively small number of prescriptions filled in 2005 using his registration number. There was no evidence directly linking either Dr. Okose or Dr. Botto to Dr. Elder.

After leaving STWC, Dr. Elder moved to the Westfield Medical Clinic ("WMC") in Houston. There, he requested copies of prescriptions he issued to patients. While the patients filled the prescriptions at local pharmacies, the copies, including a list of patient names and addresses in Dr. Elder's handwriting, were faxed from Solomon's home to TMS in Missouri. TMS's drug shipments were eventually mailed directly to ANP rather than STWC. ANP also received and filled some of Dr. Elder's duplicative WMC prescriptions. ANP employee Lillian Zapata testified that

she rode with Solomon in his BMW to "a part of Houston that I would consider the ghetto," where Solomon pulled off the road, "exchanged words" with a person who pulled behind them, handed that person a small box from the trunk, then told her, "I bet you didn't know you were riding with three million dollars."

The government's investigation of the scheme began in October 2005. As it progressed, the government subpoenaed patient medical records from Dr. Elder, STWC, and WMC, without success. During DEA interviews, Dr. Elder tried to disguise his handwriting. Later investigation revealed that Dr. Elder and Solomon placed hundreds of phone calls to each other in 2004 and 2005, including calls the day Solomon faxed Dr. Elder's WMC prescriptions to TMS, and the day the DEA conducted a warrant search of ANP's offices.

Rostie and Martin pleaded guilty to controlled substance and money laundering conspiracies. The owners of STWC were granted immunity, and the government dismissed charges against Delmon Johnson. Solomon and Dr. Elder were the only named conspirators to go to trial. Rostie, Martin, Delmon Johnson, and Pleshette Johnson-Wiggins each testified against Solomon and Dr. Elder. Dr. Okose was separately prosecuted in the Southern District of Texas.

At trial, Dr. Elder admitted he wrote the 544 original prescriptions but disputed knowing they were sent to or filled by TMS and questioned whether the refill authorization signatures were consistent with his signatures on the original prescriptions. Rostie testified that, on one occasion, she verified the legitimacy of prescriptions directly with Dr. Elder. The government's handwriting expert testified it was "highly probable" the refill authorization initials were Dr. Elder's. Dr. Elder claimed to examine all patients named in the prescriptions, but neither Dr. Elder nor his employers could produce records for any patient. Dr. Elder claimed STWC staff

were responsible for the patient files. Pleshette Johnson-Wiggins testified that Dr. Elder told her the patient charts were lost when his truck was stolen.

On appeal, Solomon and Dr. Elder argue the evidence was insufficient because the government failed to prove (i) the generally recognized and accepted standard of medical practice, and (ii) that Dr. Elder's prescriptions fell outside that standard. Unlike many cases involving distribution based on illegitimate prescriptions, the government did not elicit expert testimony that specific patients were given medications at odds with the applicable standard of care for their symptoms and medical history. See, e.g., United States v. Katz, 445 F.3d 1023, 1028 (8th Cir.), cert. denied, 549 U.S. 956 (2006); United States v. Tran Trong Cuong, 18 F.3d 1132, 1141-43 (4th Cir. 1994). "While expert testimony may be both permissible and useful, a jury can reasonably find that a doctor prescribed controlled substances not in the usual course of professional practice or for other than a legitimate medical purpose from adequate lay witness evidence surrounding the facts and circumstances of the prescriptions." United States v. Armstrong, 550 F.3d 382, 389 (5th Cir. 2008), quoted in United States v. Pellmann 668 F.3d 918, 924 (7th Cir. 2012).

In this case, the government charged a multi-state conspiracy to distribute large quantities of controlled substances based on prescriptions for lists of patients for whom there was no credible evidence of patient-doctor relationships. Like the district court, we conclude that substantial evidence supported the government's theory. The government's expert, Dr. Morgan, opined that repeatedly prescribing hydrocodone and alprazolam in combination was "extremely unusual." Government subpoenas failed to uncover patient files or charts for the patients named in Dr. Elder's prescriptions filled by TMS. STWC records showed that Dr. Elder rarely saw patients and worked only five hours a day, two or three days a week, yet he claimed to examine and prescribe medications for 544 patients during his five months at STWC. The *original* STWC prescriptions -- not copies -- were found in a small-town

Missouri pharmacy with corresponding personal information sent from Solomon's home, yet Dr. Elder testified that he gave the prescriptions directly to patients in Texas. While he worked at WMC, a clinic with no apparent ties to Solomon, Dr. Elder requested copies of patient prescriptions which Solomon then faxed to TMS along with Dr. Elder's handwritten list of patient addresses; the copied prescriptions were filled without the patients' knowledge. Finally, the evidence showed that Dr. Elder had hundreds of phone contacts with Solomon, including on the day investigators searched ANP, and that Dr. Elder initially tried to disguise his handwriting to the DEA investigators. There was substantial evidence that Solomon and Dr. Elder knowingly conspired to illegally dispense and distribute controlled substances prescribed by Dr. Elder outside the usual course of professional practice and without a legitimate medical purpose.

Dr. Elder and Solomon argue the evidence was insufficient on eight substantive distribution counts because the patients did not testify and Dr. Morgan could not "second guess" what Dr. Elder did in those cases without reviewing the patient files. The evidence that *no* patient files were found or produced cast serious doubt on whether any legitimate doctor-patient relationships existed. To further refute Dr. Elder's testimony that he examined the six patients named in the eight substantive counts, the government introduced Dr. Elder's post-indictment letter to the Texas Medical Board stating, "To the best of my knowledge, I have never served as a physician for the six individuals listed in the board subpoena." The government also presented evidence that two of these patients died before the dates of Dr. Elder's prescriptions, and invalid addresses were faxed by Solomon to TMS for the other four. When combined with the evidence previously discussed, the jury could find beyond a reasonable doubt that Dr. Elder unlawfully issued prescriptions for these medications outside the usual course of professional practice and without a legitimate medical purpose, and that Solomon aided and abetted those violations.

B. Solomon's Money Laundering Conviction. Solomon argues on appeal that the evidence was insufficient to convict him of conspiring to commit money laundering. We disagree. This count required proof that Solomon knew of and intentionally joined a conspiracy to conduct financial transactions involving drug proceeds intending either to promote the conspirators' illegal activity, or to conceal the nature, location, source, ownership, or control of the proceeds. 18 U.S.C. §§ 1956(a)(1)(A) and (B). Having found Solomon guilty of the controlled substance offenses, a reasonable jury could find that the many thousands of dollars that Solomon mailed to Rostie to pay for prescriptions filled by TMS were the proceeds of unlawful activity intended to promote additional drug trafficking. See United States v. Eastman, 149 F.3d 802, 804 (8th Cir. 1998).[3] Alternatively, the jury could reasonably find that Solomon intended to conceal the nature and source of the proceeds of unlawful activity by paying TMS with used, small denomination currency mailed to Rostie, rather than by check or STWC invoice as she expected; and by instructing his intermediary, Martin, to limit bank deposits to amounts less than $10,000 in taking her "finder's fee" of $5 per prescription. See United States v. Williams, 605 F.3d 556, 564-66 (8th Cir. 2010).

## II. Forfeiture

The indictment included an Allegation of Forfeiture. The statute provides that each defendant "shall forfeit . . . any property constituting, or derived from, any

---

[3]Citing United States v. Santos, 553 U.S. 507 (2008), Solomon urges us to reconsider cases such as United States v. Spencer, 592 F.3d 866, 879-80 & n.4 (8th Cir. 2010), where we held that "proceeds" include the gross receipts as well as the profits from drug trafficking. As a panel, we may not do so. We note that in 2009 Congress enacted 18 U.S.C. § 1956(c)(9), which expressly includes gross receipts in the definition of "proceeds." Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21, § 2(f)(1)(B), 123 Stat. 1617, 1618.

proceeds the person obtained, directly or indirectly, as the result" of the drug conspiracy. 21 U.S.C. § 853(a)(1). Following the jury verdict, the government filed a Motion for an Order of Forfeiture in the amount of $991,114, supported by a Financial Analyst's Declaration that forensic examination of TMS computers had established that $525,621 of controlled substance prescriptions were filled and sold using Dr. Elder's name, $452,538 were filled and sold for Dr. Okose, and $12,955 were sold using Dr. Botto's name. Solomon and Dr. Elder filed detailed objections and requested an evidentiary hearing. However, at the sentencing hearings, neither offered evidence on the issue. When the government advised it had a witness ready to testify, Dr. Elder's counsel stated he was satisfied to submit the issue on the briefs. At Solomon's separate sentencing hearing, he did not request an opportunity to cross examine the government's financial analyst. Thus, defendants preserved no issue of error in the district court's forfeiture procedures. See Fed. R. Crim. P. 32.2(b)(1)(A)-(B). The district court issued a Final Order of Forfeiture that each defendant "shall forfeit to the United States the sum of $991,114.00 pursuant to 21 U.S.C. § 853," and made that Order part of its final judgment. See Fed. R. Crim. P. 32.2(b)(4). Both defendants appeal the final forfeiture judgment.

A. Solomon. Solomon argues there was insufficient evidence to support the forfeiture of $911,114 because the government did not adequately support that figure at trial and failed to show which prescriptions were illegitimate. In a drug conspiracy case, defendants "may be held jointly and severally liable [in a money judgment] for all of the foreseeable proceeds of the conspiracy." United States v. Van Nguyen, 602 F.3d 886, 904 (8th Cir. 2010), cert. denied, 131 S. Ct. 897 (2011).[4] The district

---

[4]Accord United States v. Roberts, 660 F.3d 149, 165-66 (2d Cir. 2011), cert. denied, 132 S. Ct. 1640 (2012); United States v. Pitt, 193 F.3d 751, 765 (3d Cir. 1999); United States v. Candelaria-Silva, 166 F.3d 19, 44 (1st Cir. 1999), cert. denied, 529 U.S. 1055 (2000); United States v. McHan, 101 F.3d 1027, 1043 (4th Cir. 1996), cert. denied, 520 U.S. 1281 (1997).

court's determination of the amount subject to forfeiture "may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim P. 32.2(b)(1)(B); see 3 Wright & Welling, Federal Practice and Procedure § 573 (4th ed. 2011). Thus, the district court appropriately used the financial analyst's unimpeached Declaration to determine the proceeds of the conspiracy's illegal dispensing activity. We agree with the district court that the evidence at trial combined with the Declaration were more than sufficient to support a money forfeiture judgment against Solomon in the amount of the $991,114. The government was not required to prove that individual prescriptions were illegitimate when the evidence created a reasonable, indeed an overwhelmingly strong inference that all prescriptions submitted to TMS by the Houston doctors were illegitimate.

B. Dr. Elder. Dr. Elder argues that he cannot be held jointly and severally liable for any forfeiture because there was no evidence that he obtained any proceeds or profited in any way from the conspiracy. This contention ignores controlling forfeiture authority. A conspirator's forfeiture liability is not limited to the amount the government proves he personally obtained. He is jointly and severally liable to forfeit the proceeds of the criminal enterprise. As we explained in United States v. Simmons, 154 F.3d 765, 770 (8th Cir. 1998), citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946), this rule "is in accord with the traditional rules with respect to criminal conspiracy, under which all members of a conspiracy are responsible for the foreseeable acts of co-conspirators taken in furtherance of the conspiracy." Though Simmons involved a forfeiture under the RICO statute, 18 U.S.C. § 1963(a)(3), we applied this principle to a forfeiture under 21 U.S.C. § 853(a)(1) in Van Nguyen, 602 F.3d at 904.

Under this principle, joint and several forfeiture liability is not unlimited -- a conspirator is liable only for the conspiracy's illegal proceeds that were reasonably

foreseeable to him.  Simmons, 154 F.3d at 770; accord United States v. Hurley, 63 F.3d 1, 22-23 (1st Cir. 1995), cert. denied, 517 U.S. 1105 (1996).  But Dr. Elder did not raise this issue in the district court or on appeal.  The government's forfeiture Declaration included proceeds Rostie and TMS obtained using prescriptions written by or in the name of Dr. Okose and Dr. Botto after Dr. Elder left STWC and made no attempt to link Dr. Elder to the actions of these other doctors.  But during this later period, Dr. Elder continued to provide Solomon refill prescriptions and copies of other prescriptions he wrote at WMC.  Thus, the record provides no basis on which to break out amounts of the total forfeiture judgment that were not reasonably foreseeable proceeds of Dr. Elder's participation in the overall conspiracy.  Having rejected the only forfeiture argument Dr. Elder raises on appeal, we must affirm the $991,114 money judgment.[5]

### III.  Motion to Sever

Dr. Elder argues the district court abused its discretion in denying his motion to sever his trial from Solomon's because the jury could not be expected to compartmentalize the evidence as it related to these separate defendants.  "A district court may sever the jointly indicted defendants' trials if joinder appears to prejudice a defendant or the government."  United States v. Jenkins-Watts, 574 F.3d 950, 967 (8th Cir. 2009), cert. denied, 130 S. Ct. 1915 (2010), citing Fed. R. Crim. P. 14(a).  Dr. Elder does not contend that he and Solomon presented antagonistic defenses.  Rather, he argues that the "immense, separate volume of evidence" against Solomon

---

[5]We further note that two issues not raised on direct appeal -- whether Dr. Elder should be jointly and severally liable for the entire forfeiture judgment, and if so, whether the judgment violates the Eighth Amendment's Excessive Fines Clause as construed in United States v. Bajakajian, 524 U.S. 321 (1998) -- may not be ripe for final disposition at this time.  See United States v. Covey, 232 F.3d 641, 650 (8th Cir. 2000) (Loken, J., concurring); United States v. Van Brocklin, 115 F.3d 587, 601-02 & n.12 (8th Cir. 1997), cert. denied, 523 U.S. 1122 (1998).

on the money laundering conspiracy charge, in which Dr. Elder was not involved, and the "comparatively scant evidence" against him on the drug trafficking counts, establish that he was found "guilty by association."

"[D]enial of severance is not grounds for reversal unless clear prejudice and an abuse of discretion are shown." United States v. Payton, 636 F.3d 1027, 1037 (8th Cir.), cert. denied, 132 S. Ct. 349 (2011). The prejudice must be "real," that is, "something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." United States v. Mickelson, 378 F.3d 810, 817-18 (8th Cir. 2004). Dr. Elder cannot meet this heavy burden. The trial focused primarily on a drug conspiracy in which both Dr. Elder and Solomon were major participants. The evidence against Dr. Elder was far from "scant," and much of the evidence of Solomon's money laundering also related to the drug conspiracy.

The judgments of the district court are affirmed.

_____