IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Christopher Elder,                          :
                    Petitioner              :
                                            :
          v.                                :    No. 66 C.D. 2018
                                            :    Argued: November 13, 2018
Bureau of Professional and Occupational :
Affairs, State Board of Medicine,           :
                    Respondent              :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT                        FILED: March 27, 2019

          Christopher Elder petitions for review of the December 21, 2017,
adjudication of the Pennsylvania Bureau of Professional and Occupational Affairs
(Bureau), State Board of Medicine (Board), that denied his application for a license
to practice medicine and surgery.  The Board denied Elder's application because of
his 2010 felony convictions for participating in a conspiracy to distribute controlled
substances.  The Board rejected the recommendation of its Hearing Examiner that
Elder be granted a provisional license, subject to completion of a Board-approved
remediation program and followed by a three-year period of probation.  For the
reasons that follow, we vacate the Board's adjudication and remand for further
proceedings.

**Procedural Posture**

          On October 14, 2014, Elder submitted an application to the Board for a
license to practice medicine and surgery in Pennsylvania.  The Board provisionally
denied Elder's application by letter of April 2, 2015.  The Board's decision stated

several grounds. First, Section 9124(c)(1) of the Criminal History Record Information Act (CHRIA) authorized the Board to deny a license to an applicant who has been convicted of a felony. 18 Pa. C.S. §9124(c)(1). Second, Sections 22(b), (c) and 41 of the Medical Practice Act of 1985 authorized the Board to deny a license to an applicant who lacks good moral character and who cannot demonstrate the requisite training and experience. Act of December 20, 1985, P.L. 457, *as amended*, 63 P.S. §§422.22(b), (c), 422.41. Third, Elder's convictions, although under the laws of another jurisdiction, would constitute felonies under The Controlled Substance, Drug, Device and Cosmetic Act, Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. §§ 780-101 – 780-144, that bar the issuance of a medical license for ten years.

Elder appealed the Board's provisional denial, and on December 9, 2015, the Board's Hearing Examiner conducted a formal administrative hearing on Elder's appeal. Elder was represented by legal counsel and testified on his own behalf.

## Factual Background

Elder obtained his medical degree from the Medical College of Pennsylvania and Hahnemann University School of Medicine in 1999. He completed his internship in internal medicine at the Medical College of Pennsylvania and Hahnemann University School of Medicine in 2000. Elder then completed his residency at the Baylor College of Medicine in 2003. In 2005, Elder completed and received a full board certification in physical medicine and rehabilitation at the Mayo Clinic in Rochester, Minnesota.

On August 15, 2003, Elder was licensed to practice medicine and surgery in Texas. Elder began working part-time for the South Texas Wellness

Center in Houston, Texas as a *locum tenens* in August 2004, while studying for his board examination. Elder left that part-time job in January 2005.

During his tenure at the South Texas Wellness Center, Elder prescribed medication for patients, including Schedule III, IV, and V controlled substances. On February 5, 2008, the United States filed a 24-count criminal indictment against Elder and four co-defendants in the matter of *United States v. Mary Lynn Rostie, Cynthia S. Martin, Troy R. Solomon, Christopher L. Elder, and Delmon L. Johnson*,[1] in the United States District Court for the Western District of Missouri. The indictment alleged that Elder wrote 544 prescriptions for Schedule III, IV, and V controlled substances, which were not used for a legitimate medical purpose and prescribed outside the usual course of professional practice. Reproduced Record at AA376 (R.R. __).

On June 30, 2010, a jury found Elder guilty of one felony count of Conspiracy to Possess and Distribute Controlled Substances, 21 U.S.C. §§841, 846, and eight felony counts of Aiding and Abetting Distribution of Controlled Substances, 21 U.S.C. §841, 18 U.S.C. §2.[2] The sentencing judge stated that he viewed Elder's role in the conspiracy differently than the government. More specifically, the judge stated:

> Clearly Dr. Elder was found guilty by this jury of complicity in this conspiracy. I'm not sure that I agree with the government's proposition that he was the linchpin here. My guess is that from the evidence, that if Dr. Elder hadn't done it, they would have found someone else to do it.
>
> My interpretation of Dr. Elder's participation in this conspiracy was of gross negligence, not anything more than that. He ha[d]

---

[1] *United States v. Cynthia S. Martin, Troy R. Solomon, Christopher L. Elder, and Delmon L. Johnson*, Case No. 08-00026-01/02/03/04-CR-W-FJG.

[2] *United States v. Christopher Elder*, Case No. 08-00026-04-CR-W-FJG.

3

> a responsibility that he didn't fulfill. The reason why he didn't fulfill it, I'm not sure. I don't see it for financial gain necessarily because I don't see that to be the issue here. So I see it being most likely gross negligence.

R.R. AA341 (Sentencing Hearing Transcript, 5/3/2011, at 56). Elder was sentenced to a term of imprisonment of 15 months (a significant downward departure from the U.S. Federal Sentencing Guidelines) followed by two years of supervised release, and ordered to forfeit $991,114,[3] for which he was found jointly and severally liable with his co-defendants. The United States Court of Appeals for the Eighth Circuit affirmed Elder's criminal convictions.[4]

The Texas Medical Board did not take action against Elder's license as a consequence of his indictment. However, on August 23, 2010, it suspended his medical license because of his convictions. In 2012, the Texas Medical Board denied Elder's petition to terminate the suspension of his medical license. In 2014, the Texas Medical Board refused to reinstate Elder's medical license, which expired.

At the hearing on his request for a Pennsylvania medical license, Elder testified. He explained that he wants to relocate to Pennsylvania, where he earned his medical degree, to be closer to his parents who live on the East Coast. Elder also described his post-conviction activities. He volunteers for the Howard Calvert Foundation for Hunger, where he helps distribute food to the homeless and serves as a mentor to under-privileged youth. As a mentor, he helps the students build mathematical, science, verbal reasoning and verbal comprehension skills. He has also served as the foundation's inventory analyst for its food pantry. Additionally,

---

[3] The government has not begun collection proceedings.

[4] *See United States v. Christopher Elder*, 682 F.3d 1065 (8th Cir. 2012).

4

Elder volunteers to instruct paramedics and emergency medical service personnel on the placement of cervical collars and cervical spine stabilization techniques.

Since he has stopped practicing medicine, Elder has completed 78 credit hours of continuing medical education. Elder testified that he presently earns a living by working three days a week in the construction business.

Elder testified that he takes full responsibility for the actions that led to his criminal convictions. He acknowledged his failure to handle medical records appropriately. In his closing remarks, Elder stated:

> I'd like to say that I'm really remorseful for several things. One is allowing myself to be placed in a predicament to be utilized by others. That's just straight out being naïve. I'm not a criminal. I was naïve, got used, got duped … [I went into] a den of wolves who [were] taking [my] credentials and literally using them. I just didn't know better. I'm deeply remorseful that I didn't know better, or I just didn't have the insight to think like that. Doctors aren't trained to think like criminals.
>
> * * *
>
> One of the things I learned is that, I accept responsibility for my actions. My responsibility may not have been direct, but nevertheless, I am still at the end of the day accountable because [my] prescriptions appeared somewhere where they didn't belong.
>
> * * *
>
> I desire a second chance because this thing has tormented me. How could I work so hard to get used the way that I did, and I got used.
>
> * * *
>
> I absolutely accept responsibility…. Wrong people, a wrong time, and it was the wrong issue.

Notes of Testimony, 12/9/2015, at 163-170 (N.T.__); R.R. AA167-AA174.

5

Celious Barner III, a psychologist in Texas, testified that Elder is well regarded in his professional community. Barner testified that after Elder's release from prison, Elder donated his time and talent to several community-based organizations. Before Elder lost his medical license, Barner worked with Elder on an interdisciplinary team providing treatment to indigent patients who would not otherwise have had access to the level of treatment that Elder could provide. Both doctors worked on this team until 2008 and have maintained a collegial relationship and friendship. Barner stated that Elder is "very remorseful." N.T., 12/9/2015, at 28; R.R. AA32.

Lionel Lynch, a physician's assistant in Texas, testified about his professional relationship with Elder, who served as Lynch's supervisor at the South Texas Wellness Center. Lynch testified about Elder's work with patients who are indigent or less able to care for themselves. He testified that Elder had a good reputation.

Howard Calvert, CEO of the Howard Calvert Foundation for Hunger of Texas, testified about Elder's involvement with his non-profit organization, as well as Elder's mentorship to at-risk youth in the Houston area. Elder continued with this volunteer service after his release from prison and after the completion of his supervised release term.

Attorney John Osgood, who represented Elder in the federal criminal prosecution, testified on behalf of Elder. He explained that he has stayed in contact with Elder since his conviction. Osgood testified that during Elder's nearly six-month tenure at the Texas Wellness Center, he saw approximately 10 patients a day for whom he wrote prescriptions. Some patients did not fill the prescriptions locally but gave them to Solomon, who faxed them to a pharmacy in Missouri. According

to Osgood, Elder barely knew Solomon and did not know what Solomon was doing. After Elder left the facility, Solomon continued to fax expired prescriptions on which Elder had written "no refills." Osgood explained that notwithstanding Elder's conviction he was a "minimal participant" in the conspiracy. R.R. AA95. Osgood noted that Elder was not convicted of unlawful use of communication facility, *i.e.*, "the faxes." R.R. AA98. Osgood testified that Elder understands and has taken full and complete responsibility for his crimes.

Several letters were submitted attesting to Elder's character and rehabilitation. Barner, Lynch and Calvert submitted letters of support. Kerrick D. Floyd, President of AfterCare Ambulance Transfer, Inc., Troy L. Marsaw, President of Complete Management Services, and Robert J. Bacon, M.D. also submitted letters to the Board attesting to Elder's moral character and extensive volunteer work.

After the hearing, Elder filed a brief with proposed findings of fact and conclusions of law. It included the following proposed findings of fact related to his criminal convictions:

> 38. Dr. Elder's original federal criminal charge did not result in the Texas Medical Board ex parte or emergently suspending Dr. Elder's medical license. This was unusual.
>
> 39. The facts of the criminal case, set forth in Exhibits A5 and A6, focus on the facts that Dr. Elder's prescription pad was stolen and utilized to generate prescriptions in the State of Missouri.
>
> 40. Dr. Elder accepted full and complete responsibility for which the jury found him guilty, in that Dr. Elder gave a full statement to the police at the time of his initial contact.
>
> 41. Dr. Elder worked at a Southern Texas Wellness Center which was a chiropractic facility containing a pharmacy in which [Elder] saw and treated patients for six months at his first job out of medical school.

42. It was discovered by the federal authorities that Dr. Elder's medical care and treatment generated objectively based prescriptions.

43. It is those prescriptions that were photocopied and faxed from Houston, Texas by a co-defendant to Kansas City and were altered and sold by co-defendant, Troy Solomon.

44. Dr. Elder had no knowledge of Troy Solomon altering and faxing the prescriptions to Missouri and that a pharmacist in the State of Missouri, Lynn Rostie, ran the pharmacy in Missouri.

45. Dr. Elder did not have any relationship with Lynn Rostie, Cynthia Martin and was barely acquainted with Troy Solomon.

46. The criminal complaint did not include any allegation, and no evidence was introduced at trial, that Dr. Elder received any money from Troy Solomon or the other co-defendant[s] in the case.

47. Due to Dr. Elder's very minimum involvement in the federal criminal matter, the Federal District Court judge uniquely sentenced Dr. Elder below the sentencing guidelines after a contested jury trial.

Elder's Administrative Brief at 6-7; R.R. AA454-AA455 (citations omitted).

The Bureau presented no evidence at the hearing, but it filed a brief. Therein, the Bureau took the position that the Board erred in one of its stated grounds for denying Elder's application, *i.e.*, under authority of The Controlled Substance, Drug, Device and Cosmetic Act. This was because Elder's federal convictions did not constitute felonies under the Pennsylvania statute. The Bureau also took the position that the Board had legal grounds for a license denial under the Medical Practice Act of 1985 and CHRIA. However, the Bureau did not offer a recommendation on how the Board should exercise its discretion under those applicable statutes.

8

**Hearing Examiner's Findings of Fact**

Related to Elder's criminal convictions, the Hearing Examiner issued the following findings:

11. [Elder] and Co-Defendants Rostie, Martin, Solomon, and Johnson were charged with the felony Conspiracy to Possess and Distribute Controlled Substances, in violation of 21 U.S.C. §841(a)(1), (b)(1)(D), (b)(2), (b)(3) and 21 U.S.C. §846, through Count One of the criminal Indictment.

12. [Elder] and Co-Defendants Rostie, Solomon, and Johnson were charged with the felonies Aiding and Abetting Distribution of Controlled Substances, in violation of 21 U.S.C. §841(a)(1), (b)(1)(D), (b)(2) and 21 U.S.C. §2 through Counts Three (3) through Ten (10) of the criminal Indictment.

13. Counts Three (3) through Six (6) of the criminal Indictment cited to [Elder's] alleged involvement with writing prescriptions for Lorcet, Xanax, and Lortab to four (4) patients in October, 2004 during the period [Elder] worked at the South Texas Wellness Center.

14. Counts Seven (7) through Ten (10) of the criminal Indictment cited to [Elder's] alleged involvement with writing prescriptions for Hydrocodone, Alprazolam in September, 2004, to two (2) patients during the period [Elder] worked at the South Texas Wellness Center. The Counts additionally alleged that [Elder] wrote prescriptions for Hydrocodone, Alprazolam, and Promethazine with Codeine to two (2) patients in April, 2005, during a period when [Elder] no longer worked at the South Texas Wellness Center.

15. [Elder's] alleged conduct in the Criminal Matter was related to his involvement in a multi-state conspiracy to distribute large quantities of controlled substances based on prescriptions for lists of patients for whom there was no credible evidence of a patient-doctor relationship. [Elder's] alleged involvement in the conspiracy consisted of writing original prescriptions for controlled substances which were sent to Defendant Rostie at her pharmacy in Missouri to be filled before being [returned] to [Elder's] Co-Defendants in Texas for illicit distribution.

9

16. [Elder] did not derive significant monetary benefit from the activities giving rise to his criminal conviction.

Proposed Adjudication and Order, 3/10/2016, at 5-6; R.R. AA417-AA418 (citations omitted).

As to the question of Elder's remorsefulness and rehabilitation, the Hearing Examiner made the following findings of fact:

29. [Elder] has been involved with the Howard Calvert Foundation for Hunger (the "Foundation") since being released from incarceration, and has been extensively involved in the Foundation's mentorship group.

30. [Elder] tutors under-privileged youth and serves as a mentor, for the purpose of building the students' mathematical, science, verbal reasoning and verbal comprehension skills.

31. [Elder] has also served as an inventory analyst for the food pantry operated by the Foundation, and has been involved in serving meals to the homeless in the Houston, Texas area.

32. [Elder] dedicates his time to instruct paramedics and EMS personnel on the proper manner by which to place cervical collars on patients.

* * *

36. [Elder] has demonstrated sincere remorse for his actions to Dr. Barner.

40. Mr. Lynch described [Elder] as having an "outstanding" reputation for caring for indigent patients who were otherwise unable to be treated by a primary care physician.

* * *

45. Following his criminal conviction, [Elder] has undertaken efforts to educate himself regarding the proper criteria for prescribing controlled substances to patients.

10

46. [Elder] has obtained approximately 78 credits of continuing medical education since having stopped practicing medicine in 2010.

47. [Elder] had not been subject to licensure disciplinary action prior to the suspension of his Texas medical license on August 23, 2010.

48. [Elder] had not been involved in the criminal justice system prior to his criminal convictions, and he has not been involved in the criminal justice system since having been criminally convicted.

Proposed Adjudication and Order, 3/10/2016, at 9-11 (citations omitted).

The Hearing Examiner concluded that Elder's evidence demonstrated his present moral fitness to practice medicine. The Hearing Examiner observed that Elder offered evidence to establish "his 'limited role, participation, or even involvement' in the conspiracy which ultimately resulted in his criminal convictions." *Id.* at 25-26. The Hearing Examiner concluded that "the totality of the circumstances articulated above sufficiently establish that [Elder] has rehabilitated himself during the intervening passage of time, and that [Elder] does not create a substantial risk of harm to the health and safety of his patients or to the public related to his moral character." *Id.* at 28.

### Hearing Examiner's Recommendation

The Hearing Examiner reviewed the applicable provisions of law. Section 9124(c)(1) of CHRIA, 18 Pa. C.S. § 9124(c)(1), authorizes a denial of a license based on the applicant's felony convictions.[5] Section 22(b) of the Medical

---

[5] Section 9124(c)(1) of CHRIA states:

> (c) State action authorized.—Boards, commissions or departments of the Commonwealth authorized to license, certify, register or permit the practice of trades, occupations or professions may refuse to grant or renew, or may suspend or revoke any license, certificate, registration or permit for the following causes:

11

Practice Act of 1985, 63 P.S. §422.22(b),[6] requires good moral character and requisite medical training.  Finally, Sections 22(c) and 41 of the Medical Practice Act of 1985[7] authorize the denial of a license where another state has suspended or

> (1) *Where the applicant has been convicted of a felony.*

18 Pa. C.S. §9124(c)(1) (emphasis added).  In *Abruzzese v. Bureau of Professional and Occupational Affairs*, 185 A.3d 446, 453 (Pa. Cmwlth. 2018), we stated:

> CHRIA is a general law that authorizes, but does not require, an agency to suspend a license upon the licensee's felony conviction.  CHRIA does not provide any standards for the exercise of the agency's discretion under Section 9124(c)(1) to suspend or revoke a license for a felony conviction.

[6] Section 22(b) of the Medical Practice Act of 1985 states, in pertinent part:

> (b) Qualifications.—The board shall not issue a license or certificate to an applicant unless the applicant establishes with evidence, verified by an affidavit or affirmation of the applicant, that the applicant is of legal age, *is of good moral character* and is not addicted to the intemperate use of alcohol or the habitual use of narcotics or other habit-forming drugs and that the applicant has completed the educational requirements prescribed by the board and *otherwise satisfies the qualifications for the license or certificate contained in or authorized by this act*.

63 P.S. §422.22(b) (emphasis added).  In *Abruzzese*, which involved the suspension of an esthetician's license, we explained that "[t]he specific, and more relevant statute is the Beauty Culture Law [Act of May 3, 1933, P.L. 242, *as amended*, 63 P.S. §§507-527]…." *Abruzzese*, 185 A.3d at 53.  In this case, the specific and more relevant statute is the Medical Practice Act, and the only statute we consider here.

[7] Section 22(c) of the Medical Practice Act of 1985 states:

> The board may refuse to issue a license or certificate to an applicant based upon a ground for such action contained in section 41[, 63 P.S. §422.41].

63 P.S. §422.22(c).  Section 41 of the Medical Practice Act of 1985 states, in pertinent part:

> The board shall have authority to impose disciplinary or corrective measures on a board-regulated practitioner for any or all of the following reasons:
>
> > (1) *Failing to demonstrate the qualifications or standards for a license*, certification or registration contained in this act or regulations of the board.
> >
> > (2) Making misleading, deceptive, untrue or fraudulent representations in the practice of the profession or practicing fraud or deceit, either alone or as a conspirator, in obtaining a license, certification or registration or in obtaining admission to a medical college.

revoked a license. Although The Controlled Substance, Drug, Device and Cosmetic Act authorizes a revocation for ten years for felony convictions, the Hearing Examiner concluded that Elder's federal felony convictions did not constitute felonies under the Pennsylvania statute. Accordingly, The Controlled Substance, Drug, Device and Cosmetic Act did not authorize a license denial in Elder's case.

The Hearing Examiner explained that Elder's criminal conduct demonstrated moral turpitude at the time of its commission. However, the Hearing Examiner found that Elder presented persuasive evidence of his rehabilitation and present moral fitness to practice medicine. The Hearing Examiner credited the testimony of Elder's character witnesses, giving weight to their statements about his remorsefulness and rehabilitation. The Hearing Examiner found that Elder completed the terms of his punishment and has exhibited only lawful behavior during the 11 years (now 15) since he left the South Texas Wellness Center.

The Hearing Examiner acknowledged Elder's evidence that explained his personal involvement in the criminal conspiracy as well as the Texas Medical Board's refusal to reinstate Elder's license. Nevertheless, the Hearing Examiner concluded that the totality of the circumstances established that Elder had

---

(3) *Being convicted of a felony* or being convicted of a misdemeanor relating to a health profession or receiving probation without verdict, disposition in lieu of trial or an Accelerated Rehabilitative Disposition in the disposition of felony charges, in the courts of this Commonwealth, *a Federal court* or a court of any other state, territory or country.

(4) *Having a license or other authorization to practice the profession revoked or suspended* or having other disciplinary action taken, or an application for a license or other authorization refused, revoked or suspended *by a proper licensing authority of another state*, territory, possession or country, or a branch of the Federal Government.

63 P.S. §422.41 (emphasis added).

13

rehabilitated himself since his 2004 criminal conduct. The Hearing Examiner found, as fact, that Elder does not present a substantial risk of harm to the health and safety of his patients or the public, and he does not present a substantial risk of committing new crimes. In short, the Hearing Examiner concluded that Elder demonstrated the present moral character required for a license to practice medicine.

The Hearing Examiner recommended that Elder's application be granted provisionally, subject to completion of a Board-approved remediation program to bring his training up to date. He recommended that the provisional license be followed by three years of probation.

## Board's Adjudication

With limited exception, the Board adopted the Hearing Examiner's Findings of Fact and Conclusions of Law.[8] The Board denied Elder's application for a license to practice medicine and surgery. The Board agreed that Elder's volunteer work was admirable and significant and acknowledged that Elder has not been involved in any criminal activity since 2004. It also acknowledged that Elder practiced medicine without incident until his Texas medical license was suspended in 2010 as a consequence of his conviction. Although the Board adopted the Hearing Examiner's findings of fact about Elder's remorse and rehabilitation, it came to a different conclusion.

The Board explained its decision to deny Elder's license application as follows:

---

[8] The Board did not include the Hearing Examiner's finding that Elder did not gain significant monetary benefit from the conspiracy. Hearing Examiner Proposed Order and Adjudication, Findings of Fact, No. 16. The Board also added its own finding that Elder has not practiced medicine since 2010. Board Adjudication, Findings of Fact, No. 48.

14

[Elder] devoted a significant portion of the hearing towards establishing his limited role, participation, or even involvement in the conspiracy which ultimately resulted in his criminal convictions. [Elder's] testimony belies his repeated assertions that he is remorseful for his criminal conduct. Comparing [Elder's] testimony minimizing his responsibility with respect to his criminal conviction with the trial court's sense that [Elder] had not "come to grips with the severity of [his] conduct in terms of the gross negligence that [he] engaged in …" demonstrates how little progress [Elder] has made in rehabilitating himself. The United States Court of Appeals for the Eight[h] Circuit cited to various portions of the record which portray [Elder] as having played a significantly greater role in the criminal activity for which he was convicted than [Elder] suggested at the hearing. The disparity between [Elder's] interpretation of the facts proven in the criminal matter as they specifically pertained to [Elder], and the evidence of record pertaining to [Elder's] specific conduct that the Eighth Circuit for the United States Court of Appeal recognized further demonstrates [Elder's] lack of remorse. *[Elder's] lack of remorse and failure to take responsibility and ownership of his criminal conduct outweigh the societal contributions he has made in providing care, treatment, and food to indigent patients and in mentoring youth.*

Board Adjudication, 12/21/2017, at 22-23 (emphasis added) (citations omitted). The Board also explained:

In general, the *Board balances the seriousness of the underlying basis for the refusal of a license against any credible mitigating evidence* that the Applicant presents. The Board also includes other relevant facts in weighing these factors to determine whether it should license an Applicant.

[Elder] had no criminal record or professional disciplinary record prior to the conduct that led to his federal conviction and the suspension of his Texas medical license. However, [Elder] was involved in a multi-state conspiracy to illegally distribute controlled substances. Rather than to take responsibility and express remorse for his criminal misconduct during his testimony, [Elder] attempted to minimize his role. As previously noted, [Elder's] testimony demonstrates how little progress in his rehabilitation he has made since the trial judge noted [Elder] had

15

not "come to grips with the severity of [his] conduct in terms of the gross negligence that [he] engaged in." A licensee who has not recognized and accepted responsibility for his criminal conduct presents a greater risk to the public than a licensee who has accepted and takes ownership of his criminal conduct.

*Id.* at 24 (emphasis added).

The Board also denied Elder's application because he was no longer technically qualified. The Board explained that, at the time of the hearing, Elder had completed 78 continuing medical education credit hours since he stopped practicing medicine in 2010. However, Pennsylvania requires active physicians to complete 100 hours of continuing medical education every biennial renewal cycle. Further, Elder had not undertaken a practice assessment and comprehensive physician re-education program. Because medicine has changed since Elder last practiced in 2010, the Board explained it "would expect a licensee such as [Elder] who has not engaged in the practice of medicine for several years to present evidence that he had successfully and recently completed a nationally recognized, Board-approved clinical skills evaluation and remediation program…." *Id.* at 25.

## Appeal

On appeal,[9] Elder argues that the Board erred and abused its discretion in denying his application. Specifically, Elder contends that the Board failed to balance his one-time episode of criminal conduct against his extensive evidence of present good character, remorse, and rehabilitation. Elder also argues that the Board denied him due process "when it willfully and deliberately disregard[ed] competent

---

[9] This Court's review of a licensing board's disciplinary sanction determines "whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Goldberger v. State Board of Accountancy*, 833 A.2d 815, 817 n.1 (Pa. Cmwlth. 2003) (quoting *Slawek v. State Board of Medical Education and Licensure*, 586 A.2d 362, 365 (Pa. 1991)).

16

testimony and relevant evidence warranting probationary licensure with time to satisfy educational qualifications." Elder Brief at 27.

## I.

We first address Elder's contention that the Board failed to balance the limited duration of his criminal conduct against his extensive evidence of present moral character. The Board denied Elder's application based on Section 22(b) of the Medical Practice Act of 1985, which, among other things, provides that the applicant must show he is of good moral character. 63 P.S. §422.22(b).[10] The Board found that Elder's criminal convictions demonstrated a lack of moral character.

The Board, as does any licensing board, exercises considerable discretion in policing its licensees. *Ake v. Bureau of Professional and Occupational Affairs, State Board of Accountancy*, 974 A.2d 514, 519 (Pa. Cmwlth. 2009). The Board decides the weight to be assigned to mitigating evidence. *Abruzzese v. Bureau of Professional and Occupational Affairs, State Board of Cosmetology*, 185 A.3d 446, 453 (Pa. Cmwlth. 2018). However, this Court "is required to correct abuses of discretion in manner or degree of penalties imposed." *Ake*, 974 A.2d at 519 (citation omitted).

Instructive here is our Supreme Court's decision in *Secretary of Revenue v. John's Vending Corporation*, 309 A.2d 358 (Pa. 1973), which arose under a different Pennsylvania licensing statute. In *John's Vending*, the Cigarette Tax Board revoked a wholesale cigarette dealer's license because its 50-percent shareholder was convicted of selling, possessing, and transporting untaxed and unstamped liquor, and selling and possessing opium derivatives. The applicable

---

[10] *See* n.6, *supra*.

17

statute prohibited the licensing of an entity whose 50-percent shareholder is convicted of a crime involving moral turpitude. The licensee appealed.

On review, the Pennsylvania Supreme Court examined the applicable statute, which prohibits the sale of unstamped cigarettes to protect against the loss of tax revenue. To that end, the statute required the licensee to demonstrate character, integrity, and honesty. The Supreme Court found that the "past derelictions" of the 50-percent shareholder did not adversely affect his present ability to do the job lawfully. *Id*. at 361. Indeed, the officer had held a position of responsibility for a number of years after his conviction without wrongdoing. The Supreme Court explained that the nature of the offending conduct and its remoteness in time must be considered where an agency seeks to revoke a professional license on the basis of a criminal conviction. The Court further explained that "where the prior convictions do not in anyway reflect upon the [applicant's] present ability to properly discharge the responsibilities required by the position, we hold that the convictions cannot provide a basis for the revocation of a … license." *Id.* Elder contends that *John's Vending* requires a reversal of the Board's refusal to license him.

*John's Vending* requires the licensing authority to consider the relationship of a criminal conviction to the licensee's "present ability to properly discharge the responsibilities" of the licensed position. *Id.* In the case at bar, over ten years have elapsed between Elder's offending conduct and his application to practice medicine in Pennsylvania. Although not as long as the 20 years that elapsed in the case of the licensee in *John's Vending*, Elder's criminal conduct is remote and was an isolated event.

18

According to the Eighth Circuit, Elder wrote 544 prescriptions during his six-month tenure at the South Texas Wellness Center. As Elder's counsel pointed out, the government did not present evidence that the prescriptions were not medically warranted. The Board found that Elder wrote prescriptions to four patients in October of 2004 and to two patients in September 2004. Those prescriptions were then used by the co-defendants, without Elder's knowledge, after he left the South Texas Wellness Center.

In its analysis, the Board focused on the Eighth Circuit opinion and not its own findings of fact about the nature of Elder's conduct, *i.e.*, writing six prescriptions, which the sentencing judge described as gross negligence. Further, the Eighth Circuit opinion is not current. Elder has since fulfilled the terms of his sentencing, probation and post-incarceration rehabilitation work.

The Board was dismissive of Elder's mitigating evidence, stating that "[r]ather than to take responsibility and express remorse for his criminal misconduct during his testimony, [Elder] attempted to minimize his role." Board Adjudication, 12/21/2017, at 24. Elder responds that he was not minimizing his criminal conduct but explaining his role in the underlying conspiracy, which the Board misconstrued as a collateral attack on his conviction. Elder directs the Court to *Nguyen v. Bureau of Professional and Occupational Affairs, State Board of Cosmetology*, 53 A.3d 100 (Pa. Cmwlth. 2012).

*Nguyen* involved the revocation of a license to practice as a nail technologist on the basis of a federal felony. This Court set aside the licensing board's revocation because it imputed to Nguyen the culpability of another defendant that related to involuntary servitude. The Board's prosecuting staff recognized that Nguyen's conduct was not as culpable as his co-defendant. Elder

argues that *Nguyen* teaches that an applicant or licensee may, and should, explain his role in a criminal conviction that involves multiple defendants. We agree. The Board erred in drawing an adverse inference from Elder's evidence that compared his conduct to that of his co-defendants.

With respect to Elder's mitigating evidence, the Board stated that Elder's "lack of remorse and failure to take responsibility and ownership of his criminal conduct outweigh the societal contributions he has made in providing care, treatment, and food to indigent patients and in mentoring youth." Board Adjudication, 12/21/2017, at 22-23. The record does not support the Board's assertion that Elder failed to express remorse or to take responsibility for his criminal conduct. At the hearing, Elder stated that he was "really" and "deeply" remorseful and he "absolutely accept[s]" responsibility." N.T., 12/9/2015, at 163-170; R.R. AA167-AA174. He presented witnesses to attest to his remorse. The Board did not explain how this testimony was inadequate or what else Elder could have said. Elder's attempt to place his criminal conduct into context and explain his role in the conspiracy does not demonstrate a lack of remorse or rehabilitation, as the Board presumed. The Board simply made a subjective determination that was contrary to that of the Hearing Examiner, who directly observed Elder and his witnesses, and accepted his evidence on remorse.

We hold that the Board erred and abused its discretion in reaching the conclusion that Elder does not have the present moral character required for a license.[11] Elder's crimes were committed over 14 years ago and were isolated to a

---

[11] The Board noted Elder's license discipline in Texas and stated it was "reluctant to grant licensure to physicians" that have not resolved their out-of-state disciplinary issues. Board Adjudication at 24. Texas suspended Elder's license for his felony convictions and not for the way he practiced medicine. The Texas Board action is redundant of the Board's denial of Elder's application for

20

single episode in his life. He has served his sentence. The Board erred by categorizing Elder's evidence as not accepting responsibility when he was simply explaining his role in the conspiracy. The Board's conclusion on Elder's moral character cannot be reconciled with *John's Vending*, 309 A.2d 358, or *Nguyen*, 53 A.3d 1000. It did not take into account its own findings that Elder's conduct since 2004 has been not only free of criminal conduct but dedicated to significant volunteer and public service activities.

## II.

As to Elder's technical qualifications, the Board found that Elder has "made little effort to demonstrate his continued competency to practice medicine." Board Adjudication, 12/21/2017, at 25. The Board cited the Commonwealth's requirement that an active physician must complete 100 hours of continuing medical education every biennial renewal cycle, and Elder has completed only 78 hours since his Texas license was suspended in 2010. The Board noted that it would expect "a licensee such as [Elder] who has not engaged in the practice of medicine for several years" to have completed a nationally recognized, Board-approved clinical skills evaluation and remediation program similar to the post-licensure programs in the Commonwealth. *Id.*

In his Proposed Adjudication, the Hearing Examiner recognized that Elder did not maintain proficiency in medicine after his 2010 license suspension. However, instead of denying Elder's application, the Hearing Examiner recommended that Elder "undergo a clinical skills evaluation and/or remediation program" to assist the Board in its assessment of Elder's current competency. Proposed Adjudication and Order at 28-29. The Hearing Examiner recommended

---

lack of moral character as demonstrated by his conviction. The Board has an independent duty to evaluate an applicant under the laws of Pennsylvania.

21

granting Elder's license application after he completed such a Board-approved program, subject to a three-year probationary period.

Neither the Board's Final Adjudication nor its brief to this Court address why the Hearing Examiner's recommendation was not sufficient to allay the Board's concerns about Elder's technical competency. We recognize that the Board is not required to accept the Hearing Examiner's findings of fact, conclusions of law, or recommendations and has the discretion to impose disciplinary sanctions on applicants. *Abruzzese*, 185 A.3d at 453. However, the Board needed to identify, with specificity, the training Elder needs in order to qualify for a medical license in Pennsylvania.

In its brief, the Board states that the Board's "final adjudication sets forth the path by which Dr. Elder may obtain licensure in the Commonwealth." Board Brief at 27. The Board's brief suggests that Elder, *inter alia*, "consider undertaking a practice assessment and comprehensive physician re-education program that several nationally recognized programs offer or otherwise establish his current competency before re-applying for licensure." *Id.* at 28. However, the Board's final adjudication does not provide any specific direction. The Board cited Elder's failure to maintain proficiency, but it did not explain whether a physician without a license can even enroll in these re-education programs. The Board needs to identify the specific programs that Elder must complete to demonstrate present proficiency in medical science.

The Board's regulations allow it to conduct an interview to assess the competency of a physician who has been out of practice for more than four years. 49 Pa. Code §16.15(j). The Board should consider doing such an interview of Elder

22

to evaluate, *inter alia*, what training he needs to meet the proficiency requirements for a medical license.

The Board refused to grant Elder a license for the reason that he has not practiced medicine for several years. It adverted to its "expectation" that Elder should successfully complete a "nationally recognized" program, but it did not specify that program. This was error, and thus, its order will be vacated.

**Conclusion**

We hold that the Board erred and abused its discretion by using Elder's ten-year-old criminal conviction to evaluate his present moral character and by characterizing his evidence on his role in the criminal conspiracy as showing a lack of remorse. In finding Elder not qualified to practice medicine, the Board did not err. However, it failed to explain, in certain terms, what measures Elder must undertake to become qualified. Accordingly, we vacate the Board's adjudication and remand the matter to the Board for further proceedings consistent with this opinion.

_____
MARY HANNAH LEAVITT, President Judge

23

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Christopher Elder,                                      :
                              Petitioner               :
                                                       :
              v.                                       :      No. 66 C.D. 2018
                                                       :
Bureau of Professional and Occupational :
Affairs, State Board of Medicine,                      :
                              Respondent               :

# **O R D E R**

AND NOW, this 27th day of March, 2019, the order the Pennsylvania Bureau of Professional and Occupational Affairs, State Board of Medicine, dated December 21, 2017, in the above-captioned matter is VACATED, and the matter is REMANDED to the Board for further proceedings consistent with the Court's opinion.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, President Judge