Kevin Allen AKE, Petitioner

v.

**BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, STATE BOARD OF ACCOUNTANCY, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 26, 2008.
Decided May 20, 2009.
Reargument Denied July 16, 2009.

Douglas C. Hart, Pittsburgh, for petitioner.

Steven Wennberg, Counsel and Albert H. Masland, Chief Counsel, Harrisburg, for respondent.

BEFORE: SMITH–RIBNER, Judge and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.[1]

Kevin Allen Ake petitions for review of an adjudication of the Bureau of Professional and Occupational Affairs, State Board of Accountancy (Board), which revoked Ake's certificate of certified public accountant and license to practice public accounting in Pennsylvania (collectively, CPA credentials) because of his 2002 criminal harassment conviction in the State of Illinois. Ake contends that the Board abused its discretion by imposing the maximum penalty authorized by Section 9.1(a) of the CPA Law, Act of May 26, 1947, P.L. 318, added by Act of September 2, 1961, P.L. 1165, *as amended*, 63 P.S. § 9.9a(a). We agree. Accordingly, we vacate the Board's order and remand the matter for further consideration.

The facts are as follows. Ake earned his CPA credentials in Pennsylvania in 1995 and was employed by various accounting firms until he relocated to Illinois in 1998. Ake did not renew his Pennsylvania license after he moved, and it expired on April 30, 2000. In early 2007, Ake applied for reinstatement of his Pennsylvania CPA credentials, and in this application Ake identified a 2002 harassment conviction in the State of Illinois. Nevertheless, the Board reinstated Ake's CPA credentials after he completed 100 hours of continuing accountancy education.

On August 28, 2007, the Board initiated an enforcement action against Ake with a two-count order to show cause. Because of his 2002 conviction, Ake's CPA license was subject to suspension, revocation or other penalty under Section 9.1(a)(5) of the CPA Law[2] and Section 9124(c)(1) of the Criminal History Record Information Act

---

1. This opinion was reassigned to the authoring judge on February 12, 2009.

2. Section 9.1(a)(5) of the CPA Law provides in relevant part as follows:
   (a) In accordance with the procedure provided in section 9 of this act, the board may revoke, suspend, limit or otherwise restrict the certificate of a certified public accountant or the registration of a public accountant, may revoke, suspend, limit or otherwise restrict any license issued under this act ... for any one or any combination of the following causes:
   . . .
   (5) Pleading guilty to, entering a plea of nolo contendere to or being found guilty of a felony under any Federal or State law or the laws of any foreign jurisdiction.
   63 P.S. § 9.9a(a)(5).

(CHRIA), 18 Pa.C.S. § 9124(c)(1).[3] Ake filed an answer admitting the fact of his conviction and requesting a hearing to present mitigating evidence. He urged the Board to exercise leniency on the grounds that his crime was unrelated to the practice of accounting; he had truthfully disclosed his conviction to state boards and prospective employers; and he needed his CPA credentials to practice his profession and to maintain gainful employment. A formal hearing was conducted on December 11, 2007, at which Ake appeared *pro se.*

At the hearing, Ake appeared as the Board's Prosecution Division's sole witness. Ake explained that after passing the CPA examination in 1995, he worked for several years in Pennsylvania. In 1998, he moved to Chicago, where he worked for an accounting firm. In August 2000, Ake took up residence at a YMCA in Cook County, Illinois, so that he could assist an elderly member of his church who lived there. In early March 2001, Ake was evicted from the YMCA as was the member of his church, who was in his later 90's at the time. Ake believed these evictions resulted from Ake's efforts to begin a bible study program at the YMCA. Based upon this belief, Ake made a series of telephone calls to the executive director of the YMCA, described by Ake as follows:

Q. Who'd you make the phone calls to?
A. The Executive Director, Ms. Arnold—Jan Arnold—who I was talking to since I had moved into the Y back in August 2000, requesting to have the Bible Study. I had numerous conversations with her throughout this time.
Q. Well, what was the gist of the conversations then with her?
A. Basically, I basically shared what the Bible talked about was—with that kind of unnatural lifestyle—about lesbians and homosexuality.
Q. Well, at the time, did you know she was a lesbian? That you were actually talking about lesbianism with a woman who was a lesbian?
A. Oh, yeah. I knew at the time. I didn't know when I first moved in.

Notes of Testimony, 12/11/07, at 14 (N.T. __); Reproduced Record at 47a (R.R. __). The statements were not made directly to Ms. Arnold, as Ake further explained:

A. I left them on a tape machine.
Q. Oh.
A. I didn't speak to her directly. I left them on an answering machine. I didn't say anything threatening. I just made voicemail messages based on my religious—strong religious convictions after I was evicted from my own organization. I consider myself a Christian.

N.T. 16; R.R. 49a.

In April 2001, Ake was arrested and charged with the felony offense of hate crime under Section 12–7.1 of Act 5 of Chapter 720 of the Illinois Compiled Statutes, 720 ILCS 5/12–7.1.[4] He was incarcer-

---

**3.** Section 9124(c)(1) of the CHRIA provides as follows:

(c) State action authorized.-Boards, commissions or departments of the Commonwealth authorized to license, certify, register or permit the practice of trades, occupations or professions may refuse to grant or renew, or may suspend or re-voke any license, certificate, registration or permit for the following causes:
(1) Where the applicant has been convicted of a felony.
18 Pa.C.S. § 9124(c)(1).

**4.** At the time of Ake's offense, the Illinois statute defined hate crime, in part, as follows:
(a) A person commits hate crime when, by reason of the actual or perceived race,

ated for two weeks until he was able to post bail. In July 2002, Ake was convicted. The court sentenced Ake to 14 days of imprisonment, which was served by the 14 days he spent in jail in 2001 before he posted bail. The court also ordered a fine of $2,000 and 30 months of probation. The terms of his probation restrained Ake from contact with Ms. Arnold; required Ake to undergo psychological counseling, which he did through the Veterans' Administration; and required Ake to complete 200 hours of community service, which he performed at the Salvation Army. By February 2005, Ake had completed all of the conditions of his sentence and probation.

In July 2006, Ake received an offer of employment that was conditioned upon his becoming credentialed as a CPA in Illinois. He was advised by the Illinois Department of Financial and Professional Regulation that he needed to reactivate his Pennsylvania license in order to obtain a CPA certificate and license in Illinois by reciprocity. After his Pennsylvania license was reactivated, his Illinois license was also reinstated.

The Prosecution Division's case consisted of Ake's testimony and records of his Illinois conviction and sentencing. It then rested without recommending a sanction, leaving that matter to the Board's discretion.

The hearing officer then offered Ake the opportunity to present evidence in his own behalf. He testified as follows:

*I apologize if I've hurt anybody or offended somebody, but I stand on my firm religious conviction, beliefs.* And even [in] our own tax code it says being

> color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin of another individual ... he commits assault, battery, aggravated assault, misdemeanor theft ... or harassment by telephone....

married is one man and one woman.... There's a lot of things I just don't understand. And I'm sad. And I am just a good accountant. I like accounting. I haven't done anything as far as embezzling any funds or anything. I'm very up front. I take care of my own finances....

*I would have never made phone calls if I would have known that regulation was out there.* I didn't know anything about the regulation until I was handed the Indictment. I was like, wow. And I really didn't feel I was guilty. But I guess I was. According to the Law, I'm guilty. So now I know. Don't leave any—don't call people. You have freedom of speech outside, but you can't openly call somebody and explain anything any more. *So I've learned my lesson. And I apologize if I've done something wrong. I really am.* And I just come before you as a simple accountant, requesting that I'll still keep my CPA status. Because I have an excellent background in a lot of CPA firms, and none of my field work or my tax work has ever been questioned. And I'm a very ethical person and up front. And I guess I just stand here and request any additional questions you might have for me.

N.T. 26–27; R.R. 59–60a (emphasis added).

Edward L. Bianco, II, a member of the State Board of Accountancy, then questioned Ake:

Q. Do you believe that what you did was wrong?

> (b) ... Hate crime is a Class 4 felony for a first offense and a Class 2 felony for a second or subsequent offense.
720 ILCS 5/12–7.1.

A. *Making the phone calls, in hindsight, yes. I was angry at the time.* I was thrown out of my own organization for believing in something I believed in. So it was more of a this isn't right. . . . I don't understand those things. It's not right. But I can live with it, and I'll just go on. So yes, what—making the phone calls—that many phone calls—to an individual was wrong. But they could have just picked up the phone and says don't call me. But she never did. I left it to an answering machine. . . . Okay. So yeah. I kind of feel bad that I [made] the phone calls. But in the meantime, nobody ever says like stop calling, or don't call, or anything. If somebody would have said that, I would have been happy to. But I was hurt at the time.

N.T. 28–29; R.R. 61–62a (emphasis added). Mr. Bianco continued his examination with the following question:

Q. What are you going to do in the future if you had a client and you disagreed with them on a matter that wasn't part of the accounting work? How would you handle that? How have you changed now that you would handle that any differently?

A. Well, people can believe anything they wish to believe in the United States of America. People can be Buddhist or Muslim or Hindu or [Shinto] or anything like that. I do respect that. *And I will treat anybody with respect.* We have accounting rules, and I have no problems with following accounting rules. And if you want to believe in the Easter Bunny or Santa Claus, that's fine with me. I have no—not a problem with that. My problem was basically with the YMCA. Wasn't with anybody in particular.

N.T. 29–30; R.R. 62–63a (emphasis added). The hearing examiner then asked:

Q. Just to follow up with Mr. Bianco's question. I think at somewhere along the line here in your practice as a public accountant you'll probably have to deal with gay and lesbian—either your coworkers, clients—in doing your job as a CPA.

A. I have never had any problems in the past.

\* \* \*

Q. So you've come into contact with— other than the YMCA director— gays and lesbians, and you have never had any difficulty . . .

A. No. I have not.

N.T. 30–31; R.R. 63–64a.

The Board issued its final adjudication and order on May 16, 2008, revoking Ake's CPA credentials, which, under the CPA Law, meant that Ake was effectively deprived of any opportunity for reinstatement.[5] The Board reasoned that a revocation of Ake's CPA credentials would eliminate the risk of harm to those with whom he may have professional dealings as a certified public accountant if he returns to Pennsylvania; deter other Pennsylvania certified public accountants from committing felonious acts outside of the

---

**5.** Section 9.2(b) of the CPA Law states:

Unless ordered to do so by a court, the board shall not reinstate the certificate of a person to practice as a certified public accountant or the registration of a person to practice as a public accountant which has been revoked. A person whose *certification* or registration has been revoked may take the examination and apply for a certificate in accordance with section 4.2 of this act *not earlier than five years* after his certificate or registration was revoked if he desires to resume the practice of public accounting. 63 P.S. § 9.9b(b) (emphasis added).

practice of public accounting; and assure the public that only individuals of good moral character are permitted to practice as certified public accountants in Pennsylvania.

■ The Board was not persuaded by Ake's mitigating evidence, noting that his truthful disclosure of his conviction was not noteworthy because of the likelihood that such information would be requested and verified in any event. The Board also reasoned that revocation of Ake's CPA credentials in Pennsylvania would not impair his ability to earn a livelihood in Illinois. Finally, the Board expressed doubt that Ake was fully rehabilitated based upon his testimony at the hearing. Ake now petitions for this Court's review.[6]

On appeal, Ake raises several issues for our consideration. First, Ake argues that the Board abused its discretion by imposing the maximum penalty of revocation of his CPA credentials. Second, Ake contends that the Board erred in finding that he was not rehabilitated from his offending conduct because the evidence does not support that conclusion. Third, Ake asserts that the Board erred when it failed to consider that his harassing conduct would not have constituted a felony in Pennsylvania. Fourth, Ake argues that the Board's penalty constitutes an unconstitutional infringement upon his right to practice his chosen profession.

■ Ake's main argument is that the Board's imposition of the maximum allowable penalty in this case was excessive

under the circumstances and, therefore, a flagrant and manifest abuse of discretion. Ake points out that his harassing conduct was an isolated incident that occurred nearly seven years before he applied to reactivate his Pennsylvania CPA credentials. Ake also argues that the conduct for which he was convicted was unrelated to his ability to perform the responsibilities of a public accountant.

■ In reviewing Ake's claims, we recognize that the Board, like any licensing board, exercises considerable discretion in policing its licensees. However, this Court is "required to correct abuses of discretion in manner or degree of penalties imposed." *Foose v. State Board of Vehicle Manufacturers, Dealers and Salespersons*, 135 Pa. Cmwlth. 62, 578 A.2d 1355, 1359 (1990). Our Supreme Court's decision in *Secretary of Revenue v. John's Vending Corp.*, 453 Pa. 488, 309 A.2d 358 (1973), is instructive on this principle even though it arose under a different licensing statute.

In *John's Vending*, the Secretary of Revenue revoked a corporation's wholesale cigarette license because a 50 percent shareholder had been convicted of possessing and selling alcohol and opium derivatives between fifteen and twenty years earlier. In revoking the license, the Secretary relied upon a statute which provided that a license could not be issued to a corporation if a 50 percent shareholder had been convicted of a crime involving "moral turpitude." *Id.* at 491, 309 A.2d at 361.[7]

**6.** Unless the occupational licensing board is accused of bad faith or fraud, an allegation not made by Ake, the scope of appellate review of the board's disciplinary sanction is "limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Goldberger v. State Board of Accountancy*, 833 A.2d

815, 817 n. 1 (Pa.Cmwlth.2003) (quoting *Slawek v. State Board of Medical Education and Licensure*, 526 Pa. 316, 322, 586 A.2d 362, 365 (1991)).

**7.** *Foose* involved a similar issue—whether conspiracy to distribute cocaine is a crime of moral turpitude within the meaning of the Board of Vehicles Act's disciplinary provisions. We held that it is. Notably, the li-

In considering whether the revocation was proper, the Supreme Court initially noted that it was reasonable for the General Assembly to include a provision in the statute concerning the character, integrity and honesty of persons being licensed to sell cigarettes. *Id.* at 493, 309 A.2d at 361. The Court held, however, that the legislature could not have intended the statute to apply to John's Vending as there was "no material relevance between the past derelictions of [the 50 percent shareholder] and his present ability to perform duties required by the position." *Id.* The Court pointed out that because nearly twenty years had expired since the shareholder's convictions and that he had held a license for twelve years without incident, it was "ludicrous to contend that these prior acts provide[d] any basis to evaluate his present character." *Id.* at 494, 309 A.2d at 362. Accordingly, the Court held that where "prior convictions do not in anyway reflect upon the [applicant's] present ability to properly discharge the responsibilities required by the position, . . . the convictions cannot provide a basis for the revocation of a . . . license." *Id.* at 495, 309 A.2d at 362.

■ *John's Vending* teaches that the nature of the offending conduct and its remoteness in time must be considered where an agency seeks to revoke a professional license on the basis of a conviction. In this case, nearly seven years elapsed between Ake's offending conduct and his application to reactivate his Pennsylvania CPA credentials. While not as long as the twenty years that elapsed in *John's Vending,* seven years is a substantial interval of time. Moreover, Ake's conduct was isolated to calls made over a two-week period; he

has not engaged in similar conduct since his arrest.

As for the nature of the offending conduct, it is true that Section 9.1(a)(5) of the CPA Law, under which Ake was charged, authorizes a range of penalties for conviction of a felony in any jurisdiction. However, when we consider Section 9.1(a) in its entirety, it is apparent that the General Assembly drafted the disciplinary provisions of the CPA Law with an eye toward ferreting out the types of misconduct that are anathema to the accounting profession. For example, among the other grounds for discipline are fraud or deceit in obtaining a CPA certificate; dishonesty, fraud or gross negligence in the practice of accounting; conviction of any crime involving dishonesty or fraud; and violation of any federal or state revenue law. Section 9.1(a)(1), (2), (6), (6.1) of the CPA Law, 63 P.S. § 9.9a(a)(1), (2), (6), (6.1). Ake's harassing conduct in Illinois was certainly deplorable. However, it does not relate to any of the character qualities the legislature has identified as central to holding a CPA certificate, *i.e.,* honesty, integrity and being able to practice accounting in a non-negligent manner.

In short, under *John's Vending,* the Board did not have a basis to impose the maximum penalty upon Ake for his harassment conviction.

Next, we consider Ake's contention that the Board erred in finding that he was not rehabilitated. At the outset, we note that there is no requirement in the CPA Law that an individual be "rehabilitated" from a prior crime in order to be licensed as an accountant. Nevertheless, the Board made rehabilitation a factor in its analysis and, based upon Ake's hearing testimony, concluded as follows:

censee in *Foose* was subjected to a five-year suspension of his salesperson's license for a single drug conviction, whereas Ake was

subjected to permanent revocation of his CPA credentials for a single hate crime conviction.

In his testimony at the formal hearing, [Ake] expressed the view that his conduct in harassing the victim because of her sexual orientation, while regrettable, did not rise to a level requiring criminal sanction. He maintained that he was prosecuted because of the district attorney's sexual orientation, and he objected to his original mental health counselor because of the counselor's sexual orientation. These facts powerfully suggest that [Ake] has not reformed his ways. Board Opinion at 13.

The problem with the Board's analysis is the lack of any objective standard for what constitutes "rehabilitation" in this context. The Board does not attempt to provide one and, instead, pins its entire analysis on its disagreement with Ake's beliefs and opinions. Ake's testimony does indeed reveal that he believes his conduct was not felonious,[8] and that he was somehow targeted by the district attorney and his first psychological counselor for his religious beliefs about homosexuality.[9] It is not for the Board or this Court to decide whether Ake's beliefs are objectionable. The Board is not vested with authority to look into the hearts of those licensees who appear before them. The Board members may not assume the role of the proverbial thought police and require Ake or any other accountant to change his beliefs to conform with those of the Board's members.

Assuming, *arguendo*, that rehabilitation is a relevant factor, and one that can be measured, the evidence of record establishes that Ake is rehabilitated. The most objective indicator of Ake's rehabilitation is the fact that he fulfilled each term of his Illinois sentence. Ake served a 14–day term of imprisonment and paid a $2,000 fine.[10] He complied with the terms of his probation, which included refraining from contact with the victim, undergoing psychological counseling and completing 200 hours of community service. Moreover, at the hearing Ake apologized for his actions, while acknowledging the fundamental freedom all citizens of this country have in formulating their own religious beliefs. He clearly expressed the need to respect the beliefs of others in a professional setting and not to advance his own beliefs in that context.[11]

Ake did all that the State of Illinois demanded of him as punishment for his conduct, and he expressed remorse for violating the law. The Board erred in finding that Ake was not rehabilitated because he refused to apologize for his religious convictions.

---

**8.** Contrary to the Board's conclusion, Ake never testified that his conduct did not warrant any criminal sanction. He merely expressed his disbelief that making harassing phone calls is graded as a felony offense in Illinois. N.T. 11; R.R. 44a. This disbelief is apparently shared by the General Assembly, which grades harassment as a summary or misdemeanor offense. *See* n. 13, *infra*.

**9.** Ake successfully completed the psychological counseling required as a term of his probation by attending five sessions with a VA-provided professional counselor.

**10.** His 14–day incarceration was served before he was convicted and sentenced.

**11.** In response to a question about how he had changed and how he would deal with clients in the future with whom he disagreed, Ake stated that people can follow any religion and that he respected those beliefs. N.T. 30; R.R. 63a. As also explained by Ake, people have freedom of speech where it consists of standing "outside" on a street·corner shouting to strangers about what the speaker believes the Bible says, but "you can't openly call somebody and explain anything any more." N.T. 27; R.R. 60a. He stated, further, that he had never had any difficulties in the past relating to gay men and women in doing his "job as a CPA." N.T. 30; R.R. 63a.

In sum, the Board had grounds to impose a sanction upon Ake for violating Section 9.1(a)(5) of the CPA Law. However, the Board abused its discretion by imposing the most drastic available sanction. Complete revocation of a CPA's credentials should be a sanction reserved for the worst offenders, such as the licensee in *Goldberger v. State Board of Accountancy*, 833 A.2d 815 (Pa.Cmwlth.2003), whose misconduct consisted of helping to prepare an audit report that falsely inflated a company's net earnings by $75 million. A lesser sanction, such as a short-term suspension of Ake's license or imposition of a civil penalty, is more appropriate; such sanctions should not exceed the severity of the criminal sanctions imposed by the Illinois courts. A lesser sanction is also required in this case because Ake's harassing conduct does not constitute a felony in Pennsylvania.[12] Harassing phone calls in Pennsylvania constitute at most a misdemeanor, for which the Board could not revoke a CPA's credentials.[13] The Board may achieve its stated objectives of deterring other accountants from engaging in harassment with the lesser sanctions that are available where a harassment conviction occurs in Pennsylvania.[14]

For all of the foregoing reasons, we vacate the Board's order and remand for imposition of a lesser sanction.

### ORDER

AND NOW, this 20th day of May, 2009, the final adjudication and order of the Bureau of Professional and Occupational Affairs, State Board of Accountancy, in the

12. The Board argues that Ake waived his right to raise as a mitigating factor that his conduct would not constitute a felony in Pennsylvania. *See* Pa. R.A.P. 1551(a) (precluding consideration on appeal of any question not raised before the government unit). We disagree. This mitigating factor is not a new issue; it is merely a legal argument offered to support Ake's overriding contention that the Board abused its discretion in meting out the maximum allowable punishment.

13. In Pennsylvania, a person commits the crime of harassment when, with intent to harass, annoy or alarm another, he:

\* \* \*

(3) engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose;

(4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures;

(5) communicates repeatedly in an anonymous manner;

(6) communicates repeatedly at extremely inconvenient hours; or

(7) communicates repeatedly in a manner other than specified in paragraphs (4), (5) and (6).

18 Pa.C.S. § 2709(a). An offense under subsection (3) is a summary offense, while an offense under subsections (4), (5), (6) or (7) is graded as a misdemeanor of the third degree. 18 Pa.C.S. § 2709(c). Even if Ake had been convicted in Pennsylvania of the more serious crime of stalking, 18 Pa.C.S. § 2709.1, a first offense under that section is still only graded as a misdemeanor of the first degree. 18 Pa.C.S. § 2709.1(c)(1).

We note that Pennsylvania's equivalent of Illinois' hate crime law, entitled "Ethnic intimidation," provides for enhanced penalties if a person engages in harassing conduct "with malicious intention toward the race, color, religion or national origin of another individual or group of individuals." 18 Pa. C.S. § 2710(a). That section would be inapplicable to Ake since a victim's sexual orientation is not among the classifications for which penalties may be enhanced.

14. In his final issue for review, Ake argues that the Board's sanction constitutes an unconstitutional deprivation of his recognized property right to practice his chosen profession. This argument was not raised in Ake's petition for review, and so it is waived. *Lajevic v. Department of State, Bureau of Professional and Occupational Affairs*, 165 Pa. Cmwlth. 310, 645 A.2d 348, 355 (1994).

above-captioned matter, dated May 16, 2008, is VACATED and this matter is REMANDED for imposition of a lesser sanction.

Jurisdiction is relinquished.

## DISSENTING OPINION BY Judge SMITH–RIBNER.

I respectfully dissent from the decision of the majority to reverse the order of the State Board of Accountancy (Board) that revoked Kevin Allen Ake's certificate of certified public accountant and current license (CPA credentials) due to his 2002 felony "hate crime" conviction in the State of Illinois. He was charged under Section 12–7.1 of Act 5 of Chapter 720 of the Illinois Compiled Statutes, 720 ILCS 5/12–7.1,[1] and sentenced to 14 days of confinement followed by 2–1/2 years of probation that included psychological counseling and treatment. The conditions were completed as of February 2005. The majority has substituted its judgment for that of the Board in reversing its decision to revoke Ake's CPA credentials.

The legislature has conferred on the Board the discretion to determine whether an individual is qualified to hold CPA credentials in this Commonwealth. *Allen v. Department of State, Bureau of Professional and Occupational Affairs, State Board of Accountancy*, 141 Pa.Cmwlth. 418, 595 A.2d 771 (1991); *see also* Section 3(a) of the CPA Law, Act of May 26, 1947, P.L. 318, *as amended*, 63 P.S. § 9.3(a). The disciplinary sanctions imposed by an occupational licensing board also are discretionary and will be overturned only if

there has been an arbitrary exercise of the board's duties or a flagrant and manifest abuse of its discretion. *Goldberger v. State Board of Accountancy*, 833 A.2d 815 (Pa.Cmwlth.2003).

Ake applied in 2006 to reactivate his Pennsylvania CPA credentials, and the Board conducted a hearing to allow Ake a chance to present mitigation evidence. The Board observed Ake's demeanor and assessed his credibility. The record does not set out the contents of the messages that lead to Ake's hate crime conviction, but he claims that he "basically shared what the Bible talked about was—with that kind of unnatural lifestyle—about lesbians and homosexuality." Notes of Testimony (N.T.) at 14, Reproduced Record (R.R.) at 47a. Concerning the process of his criminal case, Ake testified:

> There was an intermediate step. In April of 2001, I was arrested.... And then they took my whole matter and gave it to—believe it or not—and I'd like to admit this to evidence ... The lawyer in Cook County, Illinois ... he's the one that prosecuted me—he is a lawyer for service as an openly gay Cook County Assistant State's Attorney and activism for neighborhood organizations, gay sports, and Equality Lesbian Gay Civil Rights Organization. He is an attorney, and he is now inducted into the Hall of Fame of Cook County.... They have an interesting network out there that they took this to him, and then he went ahead and prosecuted me ... for basically having speech against sexual orientation.

---

1. At the time of Ake's offense, the Illinois statute defined hate crime, in part, as follows:
    (a) A person commits hate crime when, by reason of the actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin of another individual

... he commits assault, battery, aggravated assault, misdemeanor theft ... or harassment by telephone....
    (b) ... Hate crime is a Class 4 felony for a first offense and a Class 2 felony for a second or subsequent offense.

N.T. at 17, R.R. at 50a. When asked if he was suggesting that he would not have been prosecuted but for the sexual orientation of the Assistant State's Attorney, Ake replied: "Possibly." N.T. at 40, R.R. at 73a. Ake also complained that for the counseling component of his sentence "[t]hey sent me to the first guy, and he was a[n] openly gay counselor. And I requested to get changed to a regular person at the Veterans Administration." N.T. at 19, R.R. at 52a. Although voicing apology and expressing some regret, Ake qualified that sentiment with comments such as:

And I really didn't feel I was guilty. But I guess I was. According to the Law, I'm guilty. So now I know. Don't leave any—don't call people. You have freedom of speech outside, but you can't openly call somebody and explain anything any more. So I've learned my lesson. And I apologize if I've done something wrong.

. . .

Okay. So yeah. I kind of feel bad that I make the phone calls. But in the meantime, nobody ever says like stop calling, or don't call, or anything. If somebody would have said that, I would have been happy to. But I was hurt at the time.

N.T. at 27, 29, R.R. at 60a, 62a.

The Board was unimpressed with Ake's testimony but did not render its decision because it found his views on homosexuality objectionable. Rather, it concluded that Ake's view that his harassment of a victim because of her sexual orientation should not have resulted in criminal sanction, coupled with his attitude about the sexual orientation of the prosecutor and the mental health counselor, "powerfully suggest that Respondent has not reformed his ways." Board Decision at 13. The Board stressed the need for a CPA to be of good moral character and noted that a felony conviction evidences bad character. Contrary to the majority's view, the Board did not require Ake's rehabilitation; instead, it concluded that his testimony did not contradict the finding of bad character implied by his conviction.

The Board is the ultimate fact-finder in matters involving professional licensing of accountants, and, as such, it is empowered to resolve conflicts in the evidence and to determine the credibility of witnesses. *See Shapiro v. State Board of Accountancy,* 856 A.2d 864 (Pa.Cmwlth.2004). In making the determinations, the Board is free to accept or reject the testimony of any witness in whole, or in part, even if the testimony is uncontradicted. *Barran v. State Board of Medicine,* 670 A.2d 765 (Pa.Cmwlth.1996). Moreover, findings that are not specifically challenged are binding on appeal. *Owens v. Unemployment Compensation Board of Review,* 748 A.2d 794 (Pa.Cmwlth.2000).

In his answer to the Board's Order to Show Cause Ake admitted being convicted of a felony in July 2002. Pursuant to Section 9.1(a)(5) of the CPA Law, 63 P.S. § 9.9a(a)(5),[2] Ake's felony conviction made him subject to discipline up to and including revocation of his CPA credentials. The weight that an administrative agency assigns to mitigation evidence is a matter solely within its discretion. *Burnworth v. State Board of Vehicle Manufacturers, Dealers, and Salespersons,* 139 Pa. Cmwlth. 21, 589 A.2d 294 (1991). In *Burnworth,* the Court stated: "While this Court is required to correct abuses of discretion in the manner or degree of the penalties imposed, we will not, absent a manifestly unreasonable exercise of judg-

---

**2.** Added by Section 7 of the Act of September 2, 1961, P.L. 1165.

ment, substitute our discretion for that of the Board, an administrative body endowed with expertise in matters subject to its jurisdiction." *Id.* at 296.

The Board was empowered to accord less weight to Ake's mitigation evidence than to his criminal actions. *Burnworth.* Further, it was empowered to conclude that Ake's conviction evidenced bad character. As this Court recognized in *Foose v. State Board of Vehicle Manufacturers, Dealers and Salespersons,* 135 Pa.Cmwlth. 62, 578 A.2d 1355, 1358 (1990), a rational connection between one's past derelictions and present ability to serve in a profession that requires honesty and integrity can exist "where those events occurred so recently that the particular character trait of the individual involved can be reasonably assumed to have remained unchanged." The conduct leading to Ake's conviction occurred in 2001, he was convicted in 2002, his probation ended in 2005 and he applied to reactivate his CPA credentials in 2006. It was for the Board rather than this Court to decide whether Ake's conduct occurred within such a time frame that permitted the Board to reasonably assume that the character trait at issue remained unchanged.

The majority points out that the licensee in *Foose* was subjected to only a five-year suspension of his license for his drug conviction whereas Ake's revocation was permanent. It should be recognized, however, that under the CPA Law Ake will be eligible to re-take the CPA examination and to apply for a new license after five years. This same requirement would apply even if his license had been suspended for more than five years. Section 9.2(b), (c), added by Section 7 of the Act of September 2, 1961, P.L. 1165, 63 P.S. § 9.9b(b), (c). Accordingly, the fact that Ake received a revocation instead of a suspension should have no bearing on

whether the Board abused its discretion in finding that Ake's moral character, or particular character trait, remained unchanged. I would affirm the Board's final adjudication and order because the Board did not abuse its discretion in this matter.