IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| William L. McKernan III, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 596 C.D. 2020 |
| | : | Argued: April 12, 2021 |
| Bureau of Professional and | : | |
| Occupational Affairs, State | : | |
| Board of Accountancy, | : | |
| Respondent | : | |

BEFORE:   HONORABLE MARY HANNAH LEAVITT, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge[1]

OPINION
BY JUDGE LEAVITT                              FILED: August 11, 2021

William L. McKernan III petitions for review of an adjudication of the Bureau of Professional and Occupational Affairs, State Board of Accountancy (Accountancy Board), which denied McKernan's petition for probationary reinstatement of his license as a certified public accountant. McKernan asserts that the Accountancy Board erred and abused its discretion by focusing on his decade-old criminal conviction and disregarding the unrebutted evidence of his rehabilitation and present good moral character. For the reasons set forth below, we vacate the Accountancy Board's adjudication and remand the matter for further proceedings consistent with this opinion.

---

[1] Judge J. Andrew Crompton was originally assigned to the panel and sat for oral arguments held on April 12, 2021. Judge Crompton subsequently recused, and Senior Judge Bonnie Brigance Leadbetter replaced him on the panel having reviewed the briefs and record in the matter.

**Background**

On April 24, 1991, McKernan was licensed as a certified public accountant (CPA) by the Accountancy Board. On September 22, 2010, McKernan pled guilty to charges of theft by deception for incidents that occurred in 2007 and 2008. The first involved the theft of $1,719,550.25 from a corporate client of his accounting firm, and the second involved the theft of approximately $57,000 from a Little League team for which McKernan served as volunteer treasurer. On June 1, 2011, McKernan was sentenced to a term of imprisonment of 11½ to 23 months, with eligibility for work release after 60 days of confinement, followed by 5 years of probation to be served consecutively with parole, if granted. The sentencing order required 100 hours of community service; payment of $500 in fines and costs; and restitution of $750,000 to the insurance company that had covered part of the corporate client's loss. Prior to sentencing, McKernan had fully repaid the Little League team and the corporate client for the loss not covered by its insurance policy.

On August 18, 2011, McKernan and the Bureau of Professional and Occupational Affairs (Bureau) entered into a Consent Agreement. Therein, McKernan admitted that his criminal conduct implicated several provisions of the CPA Law,[2] which authorized the suspension or revocation of his CPA license.[3] The Consent Agreement provided that McKernan would permanently surrender his CPA license and not seek a modification of the Consent Agreement without the

---

[2] Act of May 26, 1947, P.L. 318, *as amended*, 63 P.S. §§9.1-9.16b.

[3] A license may be suspended under Section 9.1(a)(2) for dishonesty, fraud, or gross negligence in the provision of an accountant's professional services; Section 9.1(a)(5) for a felony conviction under Pennsylvania law; Section 9.1(a)(6) for a conviction of a crime involving an element of dishonesty or fraud; and Section 9.1(a)(14) for conduct that brings the profession of public accounting into disrepute or reduces public esteem for the profession of public accounting. Added by the Act of September 2, 1961, P.L. 1165, 63 P.S. §9.9a(a)(2), (5)-(6), (14).

concurrence of the Bureau's Prosecution Division. By order of September 20, 2011, the Accountancy Board approved the Consent Agreement.

By 2012, McKernan had served his minimum sentence, which included work release, and was paroled. Thereafter, he was granted early termination of his probation. He also satisfied the restitution and community service requirements of his sentence.

On February 20, 2018, McKernan sought the concurrence of the Bureau's Prosecution Division to a modification of the Consent Agreement to allow the reinstatement of his CPA license. The Prosecution Division denied his request. On June 19, 2019, McKernan filed a reinstatement petition requesting the Accountancy Board to convene a "good moral character" hearing and to reinstate his CPA license in a probationary status. The Prosecution Division did not oppose the hearing but objected to the reinstatement of McKernan's license.

On November 19, 2019, the Accountancy Board held a hearing on McKernan's reinstatement petition. McKernan presented the testimony of four witnesses, all of whom testified to their knowledge of McKernan's prior criminal conduct, his alcohol abuse and treatment, his rehabilitation and his present good moral character.

The first witness, William R. Sasso, Esquire, the chairman of Stradley Ronon Stevens & Young, LLP, testified that he has known McKernan for several decades, in both a professional and personal capacity. Sasso explained that he has previously served on the State Board of Law Examiners and been appointed to serve on other governmental and quasi-governmental agencies. He acknowledged the Accountancy Board's responsibility to the profession and the public as well as the seriousness of McKernan's criminal conduct. Accordingly, Sasso explained that he took his testimony on behalf of McKernan very seriously.

Sasso attested to McKernan's remorse for his criminal conduct and to his rehabilitation. He explained that McKernan is sober, counsels people with alcohol addiction, and volunteers in his community. Sasso testified that there is "[n]o doubt in [his] mind" that McKernan is "of sound, moral character[.]" Notes of Testimony, 11/19/2019, at 16-17 (N.T. __); Reproduced Record at 81a-82a (R.R. __). Additionally, Sasso explained that he has worked with McKernan "on a number of business issues[,]" and that he has "sound judgment in that area as well." N.T. 17; R.R. 82a. Sasso acknowledged that McKernan's criminal offenses were "a serious matter." N.T. 19; R.R. 84a. Sasso testified that he believes that McKernan is truly remorseful and has been rehabilitated. Given the progress he has witnessed in McKernan, Sasso stated that he has "become convinced" that "the right thing to do is to reinstate [McKernan]." N.T. 16; R.R. 81a.

Next to testify was Gregory A. Porter, president of the Daniel Foundation, which provides "civic and spiritual renewal in the Greater Phoenixville area." N.T. 32; R.R. 97a. Porter met and counseled McKernan while his criminal charges were pending. Porter continues to counsel him on a monthly basis. Porter testified that McKernan has "paid his dues" and "demonstrated a level of trust that is incredibly significant and even unusual." N.T. 35; R.R. 100a. Porter commented on McKernan's unrelenting honesty, observing that he is "unguarded and probably, in many cases, his worst critic." N.T. 34; R.R. 99a. Porter asked McKernan to become the accountant for the Daniel Foundation and that McKernan's work "has been exemplary." N.T. 41; R.R. 106a. Porter attested to McKernan's present good moral character, as demonstrated by his actions.

The third witness, Melissa Weber, Esquire, an attorney with Elliott Greenleaf and a former prosecutor, testified to McKernan's current fitness. She has known McKernan for more than 10 years. Weber first came to know McKernan

4

when she was campaigning for state representative and McKernan was a township supervisor. She described McKernan as a different person at that point in time because of his alcoholism; he presented himself as a "big man on campus" type. N.T. 45; R.R. 110a.

Thereafter, Weber became a part of McKernan's criminal defense team. In that capacity, Weber got to know McKernan well. She explained that McKernan's decision to self-report his wrongdoings to his corporate client and to the Little League team, as well his restitution to them in full, were significant factors in his sentencing. Within a year of being placed on parole, McKernan was put on nonsupervisory probation, which means that "he would call in once a month to a preset number and have to push prompts along the way to confirm that he is compliant." N.T. 50; R.R. 115a. Weber believed that McKernan's continued work with several charitable organizations was not "done for any agenda other than a personal desire to do it[.]" N.T. 52; R.R. 117a. Weber testified that the sentencing court acknowledged McKernan's accomplishments and, thus, granted early termination of his probation.

Over the years, Weber has come to know McKernan as a friend. She explained that McKernan has stopped drinking alcohol and "has never gone back." N.T. 48-49; R.R. 113a-14a. Notwithstanding the publication of the criminal charges in the newspaper, family issues, and the impact of his actions on his accounting firm, McKernan has maintained his sobriety. Weber testified that McKernan possesses good "moral character and respect for the license of CPA." N.T. 54; R.R. 119a. She stated that McKernan would be an able practitioner and could serve the profession by mentoring young CPAs about the job and its stresses. Weber explained that she gave her testimony a lot of consideration, having served on the Pennsylvania

5

Disciplinary Board. She testified that those "with professional licenses do have [to hold themselves to a] higher standard." N.T. 54; R.R. 119a.

The fourth witness, William L. McKernan, Jr., McKernan's father, is a licensed CPA. He testified that he has worked with his son since 1994 and was painfully and fully familiar with his son's criminal conduct. He testified that when his son came to him and confessed, he was "shocked beyond belief" and "angry." N.T. 67; R.R. 132a. He did not know his son was an alcoholic. Since that time, his son has not had another drink. McKernan, Jr. testified that his son understands now that his wrongdoing impacted his family, the accounting firm and the profession.

McKernan, Jr. testified that he assisted his son with the restitution, as have other family members and his son's friends. He testified that McKernan has been paying him back monthly and has never missed a payment.

McKernan, Jr. described his son as punctual and an able accountant who produces good work. McKernan, Jr. testified that he believes his son has the requisite good moral character for reinstatement of his license. He testified that he was willing to serve as "the designated mentor, proctor, [and] reporter to [an] agent of the Board." N.T. 71; R.R. 136a. It is his hope that his son will take over the practice.

In a written statement, Michael Irvine, a principal and chief executive officer at M.F. Irvine, also attested to McKernan's rehabilitation and present good moral character. Irvine has known McKernan since 1992. He engaged McKernan to provide professional services to his company, including preparing his company's tax returns. Irvine has witnessed McKernan's true remorse, commitment to recovery and transformation into a better individual. Irvine stated that he continues to engage McKernan's professional services because he is certain of "his trustworthiness and professional competence." R.R. 42a.

6

Finally, McKernan testified on his own behalf. He described the circumstances surrounding his criminal conduct and conviction, including his struggle with alcoholism. He testified:

> I want to be clear. Alcohol didn't do this. Bill McKernan did this. The alcohol was a tool used to make me make it not feel so bad, but alcohol is not to blame for my actions. Bill McKernan is to blame for those actions.

N.T. 81; R.R. 146a. McKernan explained that he reported his conduct to the corporate client, to the Little League team, and to law enforcement authorities on his own initiative. He expressed remorse and described the steps that he has taken to ensure his 2007 criminal conduct would not happen again, including his effort to improve communication with his family. He has been sober since November 15, 2009, and continues to attend Alcoholics Anonymous meetings two to three days a week. He has learned about his triggers, *i.e.*, what drove him to drink, and how to avoid them. His sobriety gives him a clear mind and keeps him focused on being a good person. McKernan explained that he strives to follow Christian principles in living his life and is an ordained Stephen Minister at Saint Helena's Catholic Church. He volunteers with Meals on Wheels and participates in Operation Santa, which provides a holiday experience to families with children suffering from long-term illnesses.

McKernan testified that he relinquished his CPA license because "it was the right thing to do." N.T. 87; R.R. 152a. He acknowledged that his actions were deplorable. When asked why he waited nearly 10 years to seek reinstatement of his CPA license, McKernan explained that "it takes time to build [your] character back." N.T. 88; R.R. 153a.

Since his release from prison in 2011, McKernan testified that he has worked at his father's accounting firm doing corporate and personal tax work. The

7

Internal Revenue Service granted him Enrolled Agent status, which was granted after a background investigation, classes and examination. As an Enrolled Agent, McKernan may represent taxpayers before the Internal Revenue Service. He testified that he has kept up with developments in the accounting profession. McKernan affirmed his willingness to accept conditions on a reinstated license, such as monitoring by a mentor, taking continuing education courses, and undergoing a competency examination.

Finally, when asked what he has learned from his experience, McKernan testified as follows:

> You have to have your own guide[.]
>
> * * *
>
> [Y]ou need to have that compass and that compass has to be based on your beliefs and having the concept of humility. Without humility, you can't have it. We need to understand that there are times in life when you need help and you have to ask for it. And there are times in life when you don't know the answer, you go [to] the people who do. And I had to figure that out. Obviously, the hard way, and I let a lot of people down learning that.

N.T. 108; R.R. 173a.

The Prosecution Division did not present any evidence. At the conclusion of the hearing, it withdrew its objection to McKernan's request for reinstatement. However, the Prosecution Division explained that McKernan's CPA license, if reinstated, should be "on a probationary status for several years." N.T. 124; R.R. 189a. The Prosecution Division proposed that McKernan be required to take additional education classes and undergo an evaluation by the Department of State's professional health monitoring unit.

8

## Board Adjudication

The Accountancy Board denied McKernan's reinstatement petition. It reasoned as follows:

> *A consistent theme in the witnesses' testimonies was that [McKernan] is currently of good moral character and not likely to repeat the criminal activity for which he was incarcerated because he overcame his alcoholism* and continues to maintain his sobriety. . . . The reasoning is that, because [McKernan] no longer drinks alcohol[], he is presently not a financial danger to society and, thus, has good moral character. [McKernan's] testimony, however, belies the testimony of his own witnesses on this point. *At the hearing, [McKernan] stated, "Alcohol didn't do this. Bill McKernan did this.* The alcohol was a tool used to make me make it not feel so bad, but alcohol is not to blame for my actions. Bill McKernan is to blame for those actions." . . . McKernan also testified that he disclosed his criminal operation to [his corporate client's owners] because, "I couldn't live with it anymore. I mean, I - I couldn't drink enough to drown it out . . . [.]"
>
> In explaining the motivating factor causing [him] to steal, [McKernan] testified that, "[p]art of what drove me to do those things in the past was a desire to be somebody that - and I think [Ms. Weber] used it, big man on campus. I had to be the guy in the room. So when I find myself thinking about that, I talk about it."

Accountancy Board Adjudication, 5/29/2020, at 10-11 (footnotes and citations omitted). The Accountancy Board attributed McKernan's criminal offenses to a character failing. His drinking was a "tool" to cope with his guilt but not the cause of his offenses. In this regard, the Accounting Board relied on McKernan's testimony that "Bill McKernan is to blame for those actions." *Id.*

The Consent Agreement stated, as a conclusion of law, that McKernan's conduct brought the profession of public accounting into disrespect.

9

Section 9.1(a)(14) of the CPA Law.[4] McKernan's crimes were notorious, well-publicized, and a matter of public record. The Accountancy Board believed, therefore, that McKernan's actions damaged the entire profession and, as such, required a serious reckoning.

The Accountancy Board further reasoned that proving good moral character requires more than serving a criminal sentence, becoming sober and engaging in public service. It minimized McKernan's restitution to his victims as the "least that [he] could do" and suggested that this occurred only because McKernan was "fortunate enough to have family and friends who were able to lend him the money needed to pay back approximately $1.7 million." Accountancy Board Adjudication, 5/29/2020, at 15. The Accountancy Board, however, made no findings regarding McKernan's *present* moral character and did not set forth specific bases for denying his request for a license reinstatement.

The Accountancy Board concluded that McKernan broke the public's trust by his conduct, which was not limited to a "single episode," but took place over an extended period of time. Accountancy Board Adjudication, 5/29/2020, at 15. This conduct was "anathema to the profession of accounting." *Id*. at 18-19 (citation omitted). "[T]o protect the public," the Accountancy Board denied the reinstatement

---

[4] It states:

> (a) In accordance with the procedure provided in section 9 of this act, *the board may revoke, suspend, limit or otherwise restrict the certificate of a certified public accountant . . .* for any one or any combination of the following causes:
>
> * * *
>
> (14) *Conduct that brings the profession of public accounting into disrepute* or that lowers public esteem for the profession.

63 P.S. §9.9a(a)(14) (emphasis added).

10

of McKernan's CPA license. *Id.* at 19. McKernan appealed the Accountancy Board's adjudication to this Court.

## Appeal

On appeal,[5] McKernan raises three issues. First, he argues that the Accountancy Board erred because it has not set or followed an objective standard for the reinstatement of a CPA license after its revocation. It failed to evaluate the evidence of McKernan's rehabilitation, current moral character and fitness to practice his profession; instead, the Accountancy Board focused almost exclusively on his decade-old criminal conviction. Second, he argues that the Accountancy Board violated Pennsylvania precedent that has specifically established that a licensing board must consider an applicant's current fitness to hold a license after prior misconduct. Third, he argues that the Accountancy Board violated his right to due process.

## Analysis

## I. Applicable Law

The CPA Law does not set forth standards for reinstatement of a license that has been voluntarily relinquished. However, the CPA Law does address reinstatement of a license after it has been revoked or suspended. Specifically, Section 9.2(e) of the CPA Law[6] states that, "[u]pon application in writing and after hearing pursuant to notice, the [Accountancy B]oard may reinstate or modify the suspension of an individual's right to practice under section 5.2[7] of this act which

---

[5] "Our review in an appeal from a state agency adjudication [determines] whether constitutional rights were violated, an error of law was committed, or necessary findings of fact are supported by substantial evidence." *Shapiro v. State Board of Accountancy*, 856 A.2d 864, 871 n.7 (Pa. Cmwlth. 2004) (citing *Trakes v. Public School Employees' Retirement System*, 768 A.2d 357 (Pa. Cmwlth. 2001)).

[6] Added by the Act of September 2, 1961, P.L. 1165.

[7] Added by the Act of July 9, 2008, P.L. 954.

has been revoked or suspended." 63 P.S. §9.9b(e). A certified public accountant whose license has been revoked "may take the examination and apply for a certificate . . . not earlier than five years after his certificate or registration was revoked if he desires to resume the practice of public accounting." Section 9.2(c) of the CPA Law, 63 P.S. §9.9b(c).[8] Section 4.2(b) of the CPA Law[9] states in relevant part, as follows:

> (b) Before an individual may take the examination, the board shall be satisfied that the individual:
>
> * * *
>
> (2) *is of good moral character*[.]
>
> * * *

63 P.S. §9.4b(b) (emphasis added). The CPA Law does not define "good moral character."

Instructive on the meaning of "good moral character" is *Secretary of Revenue v. John's Vending Corporation*, 309 A.2d 358 (Pa. 1973). There, the Cigarette Tax Board revoked a wholesale cigarette dealer's license because its 50% shareholder had been convicted of possessing, selling, and transporting untaxed and unstamped liquor, and possessing and selling opium derivatives. The Department of Revenue revoked the corporation's license because the shareholder's convictions, which had occurred 20 years earlier, were for crimes involving moral turpitude. The Pennsylvania Supreme Court reversed the license revocation.

The Supreme Court reasoned that the "past derelictions" of the shareholder had not adversely affected the corporate licensee's conduct of its business, which had been sound and lawful. *Id*. at 361. Further, the shareholder had

---

[8] In the Consent Agreement, McKernan voluntarily agreed to the permanent surrender of his CPA license, with the provision that he could seek an amendment thereto.

[9] Added by the Act of July 9, 2008, P.L. 954.

significant responsibility for the licensee's operations during that 20-year period of time. The Supreme Court explained that the nature of the shareholder's offending conduct and its remoteness in time had to be considered. "[W]here the prior convictions do not in any[]way reflect upon the [applicant's] present ability to properly discharge the responsibilities required by the position, we hold that the convictions cannot provide a basis for the revocation of a . . . license." *Id*. at 362. In sum, *John's Vending* requires the licensing authority to consider the relationship of a criminal conviction to the licensee's "present ability to perform duties required by the [licensed] position." *Id*. at 361.

Also relevant is this Court's decision in *Elder v. Bureau of Professional and Occupational Affairs, State Board of Medicine*, 206 A.3d 94 (Pa. Cmwlth. 2019). There, Elder, a physician, was convicted of one felony count of conspiracy and eight felony counts of aiding and abetting the distribution of controlled substances. Elder wrote 544 prescriptions for controlled substances while working part-time at a clinic in Texas in 2004 and studying for his medical boards. Those prescriptions were copied and used, illegally, in Missouri to distribute controlled substances. The federal court sentenced Elder to a term of imprisonment of 15 months followed by 2 years of supervised release, observing that his participation in the conspiracy constituted "gross negligence." *Id*. at 97.

In 2014, Elder filed an application for a license to practice medicine and surgery in Pennsylvania, which was provisionally denied by the State Board of Medicine (Medical Board). Elder appealed the Medical Board's denial, and a hearing examiner conducted a formal administrative hearing.

At the hearing, Elder took full responsibility for his actions that led to his criminal convictions. He acknowledged his failure, stating that he was "really remorseful" for allowing himself "to be placed in a predicament to be utilized by

13

others." *Id*. at 97. Elder testified that his "responsibility may not have been direct, but nevertheless, [he was] still at the end of the day accountable because [his] prescriptions appeared somewhere they didn't belong." *Id*. at 97-98.

In addition, Elder testified about his post-conviction public service activities and presented the testimony of several witnesses to attest to his present moral character. One of the witnesses, a psychologist in Texas, worked with Elder on an interdisciplinary team providing treatment to indigent patients. He testified that Elder was well regarded in his professional community and "very remorseful." *Elder*, 206 A.3d at 98. Another witness was the attorney who represented Elder in the criminal prosecution and had stayed in contact with him since his conviction. The attorney testified that, during Elder's time at the clinic, he saw approximately 10 patients a day for whom he wrote prescriptions. Some of the patients did not fill the prescriptions locally, but gave them to another person, who altered and faxed the prescriptions to an out-of-state pharmacy. The attorney testified that Elder had taken full responsibility for his criminal conduct. Finally, Elder submitted several letters from individuals who attested to his present moral character and public service work in the community.

The hearing examiner recommended that Elder be granted a provisional license, subject to his completion of a remediation program approved by the Medical Board, followed by three years of probation. In so doing, the hearing examiner concluded that, although he had committed a crime of moral turpitude, Elder demonstrated that he had rehabilitated himself and demonstrated a present moral fitness to practice medicine. The Medical Board rejected the hearing examiner's

14

recommendation, reasoning that because Elder presented evidence of his lesser role in the conspiracy, this demonstrated a failure to take responsibility for his actions.[10]

On appeal to this Court, Elder argued, *inter alia*, that the Medical Board erred and abused its discretion because it "failed to balance his one-time episode of criminal conduct against his extensive evidence of present good moral character, remorse, and rehabilitation." *Elder*, 206 A.3d at 104. This Court agreed. It held that the Medical Board erred and abused its discretion in using "Elder's [10]-year-old criminal conviction to evaluate his present moral character." *Id.* at 107. In so doing, we explained as follows:

> [T]he [Medical] Board erred and abused its discretion in reaching the conclusion that Elder does not have the present moral character required for a license.[] Elder's crimes were committed over 14 years ago and were isolated to a single episode in his life. He has served his sentence. . . . The [Medical] Board's conclusion on Elder's moral character cannot be reconciled with *John's Vending*. . . . It did not take into account its own findings that Elder's conduct since 2004 has been not only free of criminal conduct but dedicated to significant volunteer and public service activities.

*Elder*, 206 A.3d at 106 (footnote and citations omitted). On the other hand, the Court agreed with the Board's finding that Elder lacked the technical qualifications for licensure. Accordingly, this Court vacated the Board's adjudication and remanded the matter to the Medical Board with instructions to provide Elder the information needed to establish his current competency for licensure.

In *Long v. Bureau of Professional and Occupational Affairs, State Board of Podiatry*, 112 A.3d 671 (Pa. Cmwlth. 2015), the State Board of Podiatry refused to reinstate a podiatry license two years after the applicant's release from

---

[10] In *Elder,* this Court noted that precedent holds that a professional license applicant is expected to explain his participation in a criminal conspiracy for which he is convicted. 206 A.3d at 105.

prison on his sentence for murder. In 2003, Long was found guilty of murder in the third degree for killing his wife and sentenced to a term of imprisonment of 5 to 10 years and to pay restitution to the victim's parents. As a result of this conviction, the Podiatry Board revoked Long's license.

While serving his sentence, Long applied for parole four times, and it was denied each time. He was released only after serving his maximum sentence. Upon his release, Long worked in construction and attempted to stay up to date on current developments in podiatry. Two years after his release, Long filed a petition for the reinstatement of his license with the Podiatry Board.

At the hearing on Long's reinstatement, Long testified on his own behalf and offered the testimony of five character witnesses, one of whom did not believe that Long had murdered his wife. The hearing examiner recommended that Long's reinstatement petition be denied for the stated reason that he "had failed to demonstrate that he had rehabilitated his character such that he had the good moral character required for licensure under the Podiatry Practice Act.[11]" *Long*, 112 A.3d at 674. The Podiatry Board adopted the hearing examiner's proposed adjudication and refused to reinstate Long's license.

On appeal to this Court, Long argued, *inter alia*, that the Podiatry Board erred. He argued that he had demonstrated good moral character at the time he applied for reinstatement and that he had the skill to resume the practice of podiatry. *Id*. at 674. This Court rejected Long's appeal. It explained:

> The [Podiatry] Board did not solely rely on [Long's] 1999 conviction in denying the [r]einstatement [p]etition; instead, it reviewed [Long's] efforts during his prison term and after to rehabilitate his character. As the [Podiatry] Board explained, "[t]he pivotal issue has to be whether [Long] has the requisite good moral character to be entrusted to hold a license to practice

_____

[11] Act of March 2, 1956, P.L. (1955) 1206, *as amended*, 63 P.S. §§42.1-42.21c.

16

podiatry today." The [Podiatry] Board determined that [Long] did not meet this standard.

*Id.* at 675-76 (footnote and citations omitted). The Podiatry Board considered Long's character witnesses but found that they offered only unsubstantiated opinions and came from a small circle of Long's friends. No witness was called to attest to Long's rehabilitative efforts or contribution to society. The Podiatry Board was also troubled that Long showed "little remorse" and had stopped his treatment with a psychologist. *Id*. at 676. Given these factual findings, this Court discerned no error or abuse of discretion in the Podiatry Board's refusal to reinstate Long's license.

A licensing board has discretion in "policing its licensees." *Ake v. Bureau of Professional and Occupational Affairs, State Board of Accountancy*, 974 A.2d 514, 519 (Pa. Cmwlth. 2009). That discretion, however, is not unfettered, and this Court "is required to correct abuses in discretion in manner or degree of penalties imposed." *Id*. (citation omitted).

With these principles in mind, we turn to McKernan's appeal.

## II. McKernan's Reinstatement Petition

In his first issue, McKernan argues that the Accountancy Board erred and abused its discretion by focusing on his 10-year-old criminal conviction to the exclusion of the extensive evidence of his present moral character. Indeed, there was no evidence to contradict any of McKernan's evidence of rehabilitation and present fitness for a license. He argues that the Accountancy Board misapplied and misunderstood legal precedent, leaving McKernan in the position that he "could not, under any circumstance, do enough" to satisfy the Accountancy Board. McKernan Brief at 57.

McKernan argues, specifically, that the Accountancy Board misapplied *Elder*. Elder's participation in a criminal conspiracy to distribute opioids reflected negatively upon the medical profession just as McKernan's theft reflected negatively

17

on the accounting profession. McKernan's situation cannot be distinguished from *Elder* on that basis, as the Accountancy Board opined. Further, the Accountancy Board's statement that Elder's conduct involved a "single episode" does not distinguish *Elder*. Elder's conduct did not involve a single *incident* but, rather, a series of prescriptions that were photocopied. McKernan argues that the Accountancy Board repeated the error of the Medical Board in *Elder* by disregarding McKernan's evidence of mitigation, rehabilitation, and good moral character. Instead, it "was guided entirely by its preoccupation with [his] decade-old conviction."[12] McKernan Brief at 45.

The Accountancy Board responds that it properly "weighed the seriousness of [McKernan's] criminal conduct and violations of the CPA Law against the mitigating evidence presented at the formal hearing." Accountancy Board Brief at 10. The Accountancy Board goes to great lengths to describe how this case is more analogous to *Long* than to *Elder*. However, both *Long* and *Elder* stand for the same proposition: a professional licensing board must consider the applicant's present ability to fulfill the duties of a licensed professional notwithstanding his prior criminal conviction. The licensing board cannot use an individual's criminal conviction as the sole basis to deny a reinstatement petition. *See Elder*, 206 A.3d at 104-06; *Long*, 112 A.3d at 674-77.

---

[12] The Act of July 1, 2020, P.L. 575 (Act 53), which amended, in part, Title 63 of the Pennsylvania Consolidated Statutes (relating to Professions and Occupations (State Licensed)), requires "state licensing boards and commissions to complete individualized assessments to determine whether [a] . . . criminal conviction is a disqualification for licensure." 63 Pa. C.S. §3113. McKernan argues that this provision is instructive because it "plainly demonstrates that, had the Board engaged in any *objective* analysis at all, a different outcome would have been mandated." McKernan Brief at 54, 57 (emphasis in original). The Accountancy Board responds that the outcome would have been the same "[b]ecause of the circumstances surrounding [McKernan's] criminal convictions . . . and [McKernan's] failure to meet all the licensing qualifications and demonstrate significant progress in personal rehabilitation." Accountancy Board Brief at 25.

The Accountancy Board also responds that it did not arbitrarily reject McKernan's evidence of good moral character but, rather, found the evidence lacking because it was "based on the faulty premise that [McKernan's] alcoholism caused him to deceptively steal money as opposed to alcohol being a means by which [McKernan] drowned out the guilt of his fraudulent activity." Accountancy Board Brief at 16-17.

In this regard, the Accountancy Board treats McKernan's statement that "Bill McKernan," not alcohol, "did this" as an admission that he lacks character. Accountancy Board Adjudication, 5/29/2020, at 10. We disagree. It demonstrates honesty and present character for McKernan to acknowledge that his criminal offenses were his responsibility. He did not use his alcohol abuse to excuse his conduct. Nevertheless, alcohol was a "tool," which is why McKernan's decade of sobriety is relevant to his assertion of rehabilitation.

Notably, the Accountancy Board did not reject any of McKernan's character witnesses as unreliable, as was the case in *Long*. McKernan's witnesses attested to their personal knowledge of his past conduct, his present character and his community service activities. The Accountancy Board did not find a "lack of remorse" by McKernan, as the Podiatry Board did in *Long*.

McKernan's application for license reinstatement differs from Long's in other ways. Long was denied parole four times and was required to serve his maximum sentence. A mere two years after his release from prison, he applied for reinstatement. By contrast, McKernan was released on parole, placed on nonsupervisory probation, had his probation terminated early, and lived and worked in the community for seven years before applying for reinstatement of his CPA license.

19

It appears that the Accountancy Board has concluded that McKernan's criminal conduct was so egregious that he can never be of good enough moral character to ever hold a CPA license again. This was error. As our Supreme Court has explained:

> [A] blanket prohibition barring anyone who has been convicted of a crime of moral turpitude without regard to the remoteness of those convictions or the individual's subsequent performance would be unreasonable. We cannot assume that the legislature intended such an absurd and harsh result. . . .
>
> *We are also mindful that such a result runs afoul of the deeply ingrained public policy of this State to avoid unwarranted stigmatization of and unreasonable restrictions upon former offenders*. . . . To forever foreclose a permissible means of gainful employment because of an improvident act in the distant past completely loses sight of any concept of forgiveness for errant behavior and adds yet another stumbling block during the difficult road of rehabilitation.

*John's Vending*, 309 A.2d at 362 (citation omitted and emphasis added).

Consistent with these principles, Section 4.2(b)(2) of the CPA Law, 63 P.S. §9.4b(b)(2), requires the Accountancy Board to consider whether an applicant for reinstatement of a CPA license is of present good moral character, notwithstanding past misconduct. McKernan presented extensive evidence of the steps he has taken to be rehabilitated; of his present moral character; and of his personal responsibility for his mistakes. The Prosecution Division did not present any evidence to refute any of McKernan's evidence.

The Accountancy Board assumes that if McKernan's CPA license is reinstated, the "public esteem for the profession" will be lowered. Section 9.1(a)(14) of the CPA Law, 63 P.S. §9.9a(a)(14). There is no evidence in the record to support this assumption. More importantly, the Accountancy Board failed to acknowledge the significance of McKernan's decision to self-report his crimes to his victims and

20

to the Accountancy Board. Self-reporting by professionals is conduct to be encouraged. This will not be the case if it is effectively impossible for a self-reporting licensee ever to demonstrate rehabilitation.

In denying McKernan's reinstatement petition, the Accountancy Board stated:

> Proving present good moral character which warrants reinstatement of a CPA license cannot, under these circumstances, be as simple as showing that [McKernan] complied with his criminal sentencing, stopped drinking, and continues to perform community service[.]

Accountancy Board Adjudication, 5/29/2020, at 15. The Accountancy Board, however, never identified what more McKernan could have presented to show his present good moral character.

The Accountancy Board erred and abused its discretion in concluding that McKernan did not demonstrate present good moral character. The Accountancy Board did so by focusing on McKernan's decade-old conviction and disregarding his extensive and reliable evidence of rehabilitation. McKernan's evidence in this regard bears no relation to the evidence presented by the applicant in *Long*, which was held inadequate. We hold that McKernan has demonstrated that he has the present good moral character that is required for a CPA license.

## Conclusion

For the above-stated reasons, we vacate the Accountancy Board's adjudication and remand McKernan's petition for reinstatement of a probationary CPA license to the Accountancy Board. The Accountancy Board shall direct McKernan in the steps he must take for reinstatement of a CPA license, including any conditions pertaining to examination, education, evaluation by the Department's

health monitoring unit and a term of probation that the Accountancy Board deems appropriate given McKernan's past conduct.[13]

_____
MARY HANNAH LEAVITT, President Judge Emerita

President Judge Brobson, Judge Fizzano Cannon and Judge Crompton did not participate in the decision in this case.

---

[13] Because we vacate the Accountancy Board's adjudication on grounds that it erred and abused its discretion, we do not address McKernan's due process arguments.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

William L. McKernan III,                    :
                          Petitioner        :
                                            :
         v.                                 :    No. 596 C.D. 2020
                                            :
Bureau of Professional and                  :
Occupational Affairs, State                 :
Board of Accountancy,                       :
                          Respondent        :

# **O R D E R**

AND NOW, this 11th day of August, 2021, the adjudication of the Bureau of Professional and Occupational Affairs, State Board of Accountancy (Accountancy Board) dated May 29, 2020, in the above-captioned matter is VACATED, and the matter is REMANDED to the Accountancy Board for further proceedings in accordance with the accompanying opinion.

Jurisdiction relinquished.


_____
MARY HANNAH LEAVITT, President Judge Emerita